[No. B196331. Second Dist., Div. Three. Oct. 2, 2007.]

In re P.A., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
ROBERT A., Defendant and Appellant.

■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

## Counsel

Jill Regal, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**KLEIN, P. J.**—Robert A. appeals an order of the juvenile court terminating his parental rights with respect to P.A. We conclude the juvenile court erroneously denied Robert A. family reunification services on the basis his whereabouts were unknown, without first requiring the Los Angeles County Department of Children and Family Services (DCFS) to provide a completed declaration of due diligence. However, Robert A. forfeited the right to raise this issue on appeal by failing to raise it in the juvenile court. We further conclude the juvenile court made findings of parental unfitness sufficient to support the order terminating Robert A.'s parental rights. Because each of Robert A.'s assignments of error lacks merit, we affirm the order terminating parental rights.

### FACTS AND PROCEDURAL BACKGROUND

1. *Detention of P.A. and her siblings.*

On December 30, 2004, DCFS filed a dependency petition with respect to three-year-old P.A. and her half siblings, two-year-old Leslie and infant Destiny after Destiny and mother tested positive for methamphetamine at the time of Destiny's birth. The children were placed with maternal grandmother, where they had been living with mother prior to DCFS intervention. The

detention report indicated mother admitted methamphetamine use and that she last used methamphetamine two days before she gave birth to Destiny. Mother indicated Robert A. was P.A.'s father and that his whereabouts, as well as the whereabouts of the fathers of her other two children, were unknown.

At the detention hearing on December 30, 2004, the juvenile court directed DCFS to present evidence of due diligence in attempting to locate the children's fathers. In response to questions from the juvenile court, mother indicated she lived with Robert A. for seven or eight months. Mother had an address in Downey for Robert A. at her home and indicated she would give that address to the caseworker. Mother had no information as to the whereabouts of the alleged fathers of Leslie or Destiny.

The jurisdiction/disposition report indicated mother told the CSW (children's social worker) that none of the children's fathers had shown interest in supporting mother or being involved in his child's life and mother did not expect any of them to come forward. Mother told the CSW that Robert A. last saw P.A. when the child was six months of age. Mother had an old telephone contact number for Robert A., but it had been disconnected. On January 13, 2005, DCFS obtained a date of birth for Robert A. A declaration of due diligence dated January 20, 2005, regarding Robert A. indicated DCFS sent letters to the DMV (Department of Motor Vehicles) and voter registration with Robert A.'s date of birth but no response had been received.

### 2. Dependency petition sustained; Robert A. denied family reunification services.

On January 20, 2005, mother waived her rights with respect to the dependency petition. The juvenile court declared Robert A. the presumed father of P.A., noted the declaration of due diligence was incomplete with respect to Robert A., and continued the matter to allow DCFS to file a completed declaration of due diligence.

An information for court officer form filed February 2, 2005, indicated DCFS had not yet received responses from the DMV and voter registration with respect to Robert A.'s whereabouts.

On February 2, 2005, the juvenile court indicated the matter had been continued "solely for the purpose[] of getting the due diligence for [Robert A.]" The juvenile court found the current declaration was substantially complete and stated: "My understanding is we haven't seen [Robert A.] for a long time, correct?" Mother's counsel agreed with the juvenile court's assessment. The juvenile court thereupon found notice proper but directed

DCFS to file a completed declaration of due diligence with respect to Robert A. The juvenile court indicated it wished to move forward, and found the children dependents under Welfare and Institutions Code section 300, subdivision (b).[1] The juvenile court denied Robert A. family reunification services under section 361.5, subdivision (b)(1), finding his whereabouts unknown.

The juvenile court continued the matter to March 3, 2005, and ordered DCFS to submit a declaration of due diligence. However, on the continued date DCFS submitted due diligence information relating to one of Destiny's alleged fathers, and the juvenile court denied family reunification services as to that alleged father.

### 3. *Mother fails to reunify.*

A status review report prepared for August 3, 2005, indicated mother was making progress in her programs and classes but had missed numerous drug tests. The juvenile court continued the case for further review to November 30, 2005.

A social report prepared for November 30, 2005, indicated mother had ceased cooperating in the case plan and had not made any attempts to contact the CSW since September. The juvenile court admonished mother to resume drug testing and ordered DCFS to assist mother in enrolling in court-ordered programs and testing.

A status review report prepared for February 1, 2006, indicated mother was visiting on a weekly basis but was not in compliance with the case plan. Robert A.'s whereabouts remained unknown and mother had not had contact with him in a long time. On January 25, 2006, mother told the CSW, "I could not give you information on any of [the fathers] because I have not had any type of contact with them. I have no idea where they could be. I have had no contact with any of them in a long time. . . . [Robert A.] used to live in the City of Norwalk and [he] moved and I have no clue where [he] could be." Mother also stated she did not have Robert A.'s last known address.

On February 1, 2006, the juvenile court terminated family reunification services and set the matter for a hearing under section 366.26 on May 31, 2006. The report prepared for that date indicated a strong likelihood maternal grandmother would adopt the children if parental rights were terminated.

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

### 4. *Proceedings in advance of the permanency planning hearing (§ 366.26).*

#### a. *DCFS reinitiates the search for Robert A.*

On February 24, 2006, and again on March 2, 2006, DCFS mailed notice of the May 31, 2006 hearing under section 366.26 to Robert A. at an address on Dartmoor Avenue in Norwalk. DCFS obtained this address after mother's case was reassigned and the newly assigned CSW, Cecelia Cervantes, noticed the declaration of due diligence for Robert A. was incomplete. Cervantes initiated a new due diligence search for Robert A. on January 24, 2006, and on February 10, 2006, received two possible street addresses for Robert A. from the DMV, one of which was the address on Dartmoor Avenue in Norwalk.

On March 2, 2006, Cervantes went to the Dartmoor Avenue address and gave paternal grandmother notice of the hearing under section 366.26 scheduled for May 31, 2006, discussed the case with her and asked that she give the notice to Robert A. Cervantes thereafter mailed notice of the section 366.26 hearing to Robert A. at the address. Cervantes later was informed by Robert A. and paternal grandmother that paternal grandmother gave the notice to Robert A. Attached to Cervantes's declaration is a declaration of due diligence which indicates that on February 10, 2006, Cervantes made an unannounced visit to paternal grandmother's home. Paternal grandmother indicated Robert A. frequently was present at the home, but he did not live there and she did not have his address.

On May 31, 2006, a paternal aunt and uncle appeared at the scheduled hearing under section 366.26. The juvenile court found notice proper, noting Robert A. had been served by substituted service on paternal grandmother.[2] The juvenile court granted DCFS's request for a continuance of the hearing under section 366.26 to July 26, 2006, to allow DCFS to complete the home study on maternal grandmother's home. The juvenile court asked Robert A.'s relatives who were present in the courtroom to advise Robert A. that P.A. was going to be adopted and, if Robert A. did not agree with that, he "needs to contact the worker immediately, and he needs to contact the court to let me know."

---

[2] Based on this comment, it appears the juvenile court was aware of CSW Cervantes's contact with paternal grandmother relative to giving Robert A. notice. Thus, we grant DCFS's request that we take additional evidence on appeal consisting of the declaration of CSW Cervantes and the attached declaration of due diligence to clarify how DCFS located Robert A. Because the matters contained in Cervantes's declaration apparently were presented to the juvenile court, it is not inappropriate for this court to consider the declaration in connection with Robert A.'s appeal. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541].)

A social report prepared for July 26, 2006, indicated paternal grandmother and paternal aunt visited P.A. on June 1, 2006, and the next day Robert A. and paternal aunt visited. However, Robert A. had not yet contacted DCFS, and his whereabouts remained unknown.

### b. *Robert A. appears in juvenile court.*

On July 26, 2006, Robert A. appeared in court, and counsel was appointed to represent him. The juvenile court indicated the case plan was adoption but the home study was not yet complete and the case file was not in the courtroom. In response to a question from the juvenile court, Robert A. indicated he learned of the case when the people residing at his former residence gave his family a letter concerning this case. Robert A. indicated his father was ill in Tijuana and Robert A. spent much time caring for him. Robert A.'s counsel stated mother and P.A. lived with Robert A. in paternal grandmother's home for the first two years of P.A.'s life until mother began to abuse drugs and left with the child. When the juvenile court asked how Robert A. wished to proceed, counsel stated Robert A. had signed a section 388 petition and once the legal file had been located, counsel would "go through [it] and prepare a [petition under section] 388." The juvenile court continued the hearing for three months to October 25, 2006. Robert A. indicated his current address was at his mother's home on Dalewood Avenue in Pico Rivera.[3]

### c. *Social reports detail further history of the case.*

#### (1) *Robert A. and paternal grandmother.*

A social report prepared for October 25, 2006, indicated that on October 5, 2006, the CSW interviewed paternal grandmother, who stated she lives in a four-bedroom home with her husband and six of their children, namely, 25-year-old Robert A., and his siblings, who were 17, 11, 9, 6 and 3 years of age. Paternal grandmother also has two adult daughters who lived outside the home. Paternal grandmother claimed mother lived with her for two or three years before P.A.'s birth and for approximately nine months after P.A. was born. Paternal grandmother and Robert A. visited P.A. on a weekly basis at maternal grandmother's home until the child was two and one-half years of age. They stopped visiting because mother gave Robert A. "a hard time" and one of mother's boyfriends threatened Robert A. Paternal grandmother denied that Robert A. drank or used drugs and denied he ever struck mother. When

---

[3] Nothing in the record on appeal or the briefs of the parties explains the apparent discrepancy in paternal grandmother's reported addresses, one being on Dartmoor Avenue in Norwalk where CSW Cervantes contacted paternal grandmother and gave her notice of the proceedings, and the other being on Dalewood Avenue in Pico Rivera.

paternal grandmother claimed she and Robert A. were unaware of any problem with P.A. until recently, the CSW reminded paternal grandmother that the CSW gave paternal grandmother notice of the permanency planning hearing and spoke to paternal grandmother for almost an hour about the case in March of 2006. Further, the CSW asked paternal grandmother to have Robert A. contact DCFS. Paternal grandmother indicated she gave Robert A. the information but he must have forgotten. Paternal grandmother again indicated she would ask Robert A. to telephone the CSW when he returned from work.

On October 11, 2006, the CSW contacted Robert A. by telephoning paternal grandmother. Robert A. admitted he received notices concerning the case "back then, but I was just busy at work and looking to move to Fresno. I really didn't think it was serious and I really didn't look at the notices." Robert A. also had been traveling back and forth to Tijuana to care for his ill father. Robert A. recalled mother lived with him at paternal grandmother's home for approximately two years and he lived with mother at maternal grandmother's for about one year. Robert A. left because of mother's drug use. Robert A. claimed he visited P.A. every weekend after he moved from maternal grandmother's home and that he stopped visiting due to problems with mother's boyfriend, who threatened his life. Robert A. claimed he assisted mother financially with cash or checks but later said he did not give mother money because he knew she wanted it for drugs. Robert A. denied the use of drugs or alcohol, denied domestic violence and denied he had ever been arrested. However, Robert A.'s criminal record reflected numerous arrests, including arrests for driving under the influence on February 26, 2006, and possession for sale of marijuana on May 23, 2006. Regarding the latter arrest, father stated: "They can't prove anything. I don't do or sell drugs."

After the interview, the CSW received a subsequent arrest notification which indicated that on September 26, 2006, police officers stopped Robert A.'s car for having a cracked windshield and detected the odor of marijuana. Police officers found one pound of marijuana in the car in a green canvas bag that also contained paperwork dated September 15, 2006, with Robert A.'s name on it. Robert A.'s license was revoked and the passenger, Robert A.'s 17-year-old brother, was in possession of marijuana and a pipe. The police report indicated Robert A. admitted ownership of the green canvas bag but denied knowledge of the marijuana it contained. Robert A.'s brother told the arresting officers the marijuana in the canvas bag was for his personal use and Robert A. had no knowledge of its presence.

When the CSW questioned Robert A. about this arrest, Robert A. denied knowledge of the drugs and stated, "The other guy [his 17-year-old brother] already admitted to everything and he told them that the drugs were his."

Robert A. indicated he intended to fight the case. The sheriff's department advised the CSW the case remained under investigation. The CSW noted Robert A. had tested negative twice for alcohol but only recently had been referred for drug testing. Robert A. claimed he worked construction but could not document his employment because he was paid in cash.

The CSW monitored two visits between Robert A. and P.A. Both visits went well. However, P.A. told the CSW that Robert A. only visited her when she was a baby.

(2)  *Mother and maternal grandmother.*

In an interview conducted on October 4, 2006, maternal grandmother told the CSW that mother never prevented Robert A. from visiting P.A. Rather, mother insisted on monitored visits after mother learned Robert A. was leaving P.A. at paternal grandmother's home where P.A. was not being supervised properly. Robert A. also threatened to take the child to Mexico. Maternal grandmother indicated Robert A. last saw P.A. when she was about a year and a half old. Maternal grandmother denied that paternal grandmother ever visited P.A. on a regular basis and indicated Robert A. and his brother were involved in selling drugs. Robert A. gave mother $20 on a couple of occasions. When mother lived with Robert A. at paternal grandmother's home, he was abusive toward mother, and maternal grandmother had to pick mother up in the middle of the night at paternal grandmother's home on several occasions.

On October 5, 2006, mother indicated she and Robert A. were "together for three years on and off." Mother stayed at paternal grandmother's home on weekends prior to P.A.'s birth but lived with maternal grandmother until P.A. was approximately two months old. Mother then lived at paternal grandmother's home for approximately three months. When mother moved into paternal grandmother's home, Robert A. became abusive. He went to Las Vegas every weekend on "business." Mother found bricks of marijuana behind the dresser in his room. When mother returned to maternal grandmother's home, Robert A. visited for about one month and stopped visiting when P.A. was six months old. When P.A. was eight months old, Robert A. moved into maternal grandmother's home and they tried to work things out but it only lasted for about two months. Thereafter, Robert A. rarely visited. Although mother attempted to get financial support from Robert A., his contribution toward P.A.'s expenses consisted of $20 that he gave mother on two occasions after mother encountered Robert A. on the street; on another occasion paternal grandmother gave mother $20. Mother once confronted Robert A. in a nightclub and yelled at him for spending money to drink with his friends but failing to support P.A. Mother threatened Robert A. with child support but

"he didn't care because he never had a job and he told me that he was not going to get one because he wasn't about to allow anyone to take money from him to give to me." Robert A. visited once when P.A. was about two and a half but got a telephone call at the start of the visit and had to leave. Mother indicated P.A. knew who her father was because mother always pointed him out when they saw him on the street. Robert A. visited a total of about five times from the time P.A. was one year old until she was three years of age. He then stopped visiting completely until recently. Mother indicated she would have welcomed Robert A.'s visits with P.A. but would not permit unmonitored visits because Robert A. did not know how to care for the child and he left the child at paternal grandmother's home, where P.A. was neglected. Mother indicated Robert A. was arrested and jailed for approximately three months on drug-related charges when P.A. was about one year old. Mother indicated paternal grandmother visited, at most, twice when P.A. was between one and two years of age.

### d. *The section 366.26 hearing continued further.*

On October 25, 2006, Robert A. appeared with counsel for a hearing under section 366.26. The juvenile court noted a completed home study remained outstanding and asked how Robert A. wished to proceed. Counsel responded that Robert A. "disputes the majority of the representations in the [most recent social] report" and indicated the matter should be set for a contested hearing. When the juvenile court asked what Robert A.'s claim would be, counsel responded Robert A. would assert the parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A). Counsel concluded by stating counsel would discuss the matter with Robert A. "and perhaps he'll file a [petition under section] 388 before then." The juvenile court continued the matter to January 24, 2007.

Maternal grandmother's approved home study was received by the juvenile court at a hearing on December 20, 2006. A social report indicated Robert A. was visiting P.A. weekly but he failed to appear for drug tests on November 22 and December 22, 2006. DCFS recommended Robert A.'s visits remain monitored because of his missed drug tests, his drug-related arrest and his attempt to conceal his criminal history.

A social report prepared for the January 24, 2007 hearing indicated Robert A. was visiting P.A. weekly but usually brought several of his younger siblings with him. The presence of these additional children prevented Robert A. from dedicating his time to P.A. When Robert A. did visit alone, he sat and talked to P.A. and pushed her on the swings. Robert A. told the CSW he wanted P.A. placed with him.

e. *Termination of parental rights.*

On January 24, 2007, the juvenile court conducted the section 366.26 hearing. At that hearing, Robert A.'s counsel requested a continuance to permit counsel to verify that Robert A. missed drug tests on November 22 and December 22, 2006, only because there was a problem with the computer and Robert A. subsequently retested. The juvenile court denied the request for a continuance, finding good cause had not been shown.

Counsel for Robert A. then objected to termination of parental rights. Counsel argued P.A. would be better off in the care of Robert A. at paternal grandmother's home. Robert A.'s counsel further claimed P.A. lacked sufficient stimuli at maternal grandmother's home and maternal grandmother failed to disclose mother's continuing drug use in maternal grandmother's home. In connection with Robert A.'s claim the parental relationship exception to termination of parental rights applied, the juvenile court noted Robert A. failed to visit P.A. "for years at a time" and he has "had very little contact with the child." The juvenile court thereafter terminated Robert A.'s parental rights with respect to P.A.

## CONTENTIONS

Robert A. contends the juvenile court erroneously denied family reunification services without a completed affidavit of due diligence, the juvenile court violated Robert A.'s due process rights by failing to give him notice of the jurisdiction and disposition hearings, and the termination of his parental rights without any finding he was an unfit parent constituted a denial of due process.

## DISCUSSION

1. *Robert A. has forfeited the notice-related issues by failing to raise them in the juvenile court.*

Robert A. contends the juvenile court erroneously denied family reunification services without first obtaining a completed affidavit of due diligence. Robert A. notes section 358, subdivision (a)(3), requires notice before a parent may be denied family reunification services under section 361.5, subdivision (b). Where notice cannot be given, a completed declaration of due diligence must be provided. Section 361.5, subdivision (b)(1), states, in part, "A finding pursuant to this paragraph [whereabouts of a parent are unknown] shall be supported by an affidavit or by proof that a reasonably diligent search has failed to locate the parent or guardian." Robert A. claims

DCFS did not conduct a diligent search and the CSW failed to make a thorough inquiry of mother who had Robert A.'s last known home address and his disconnected telephone number.

Robert A. further contends his due process rights were violated when he was not given notice of the jurisdiction and disposition hearings. Robert A. argues that, by the time DCFS located him, the case had proceeded to the permanency planning hearing. Thus, Robert A. was deprived of the right to seek custody of P.A. or to reunify with the child. (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 106 [100 Cal.Rptr.2d 649].) Robert A. concludes the order terminating his parental rights must be set aside and the matter remanded for further proceedings.

We agree the due diligence declaration in the juvenile court file at the time the juvenile court denied Robert A. family reunification services was inadequate. Consequently, the dependency proceedings were defective as to Robert A. from the outset for want of proper notice. (See *In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598–599 [102 Cal.Rptr.2d 109]; *David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1016 [26 Cal.Rptr.2d 586]; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418 [286 Cal.Rptr. 239].) However, it is also apparent that Robert A. failed to seek relief in the juvenile court on any of the grounds he now raises on appeal. Rather, Robert A. submitted to the jurisdiction of the juvenile court.

Specifically, Robert A. attended juvenile court hearings on July 26, 2006, October 25, 2006, and January 24, 2007. On July 26, 2006, the juvenile court appointed counsel to represent Robert A. and advised Robert A. the permanent plan for P.A. was adoption. Counsel stated Robert A. had *signed* a section 388 petition and once the legal file had been located, counsel would "go through [it] and prepare a [petition under section] 388."

On October 25, 2006, Robert A. appeared with counsel for a hearing under section 366.26. The juvenile court noted maternal grandmother's completed home study remained outstanding and asked how Robert A. wished to proceed. Counsel responded Robert A. "disputes the majority of the representations in the [most recent social] report" and indicated the matter should be set for a contested hearing. When the juvenile court asked what Robert A.'s claim would be, counsel responded Robert A. would assert the parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A). Counsel concluded by stating counsel would discuss the matter with Robert A. "and perhaps he'll file a [petition under section] 388 before then."

On December 20, 2006, counsel for Robert A. attended a hearing at which the juvenile court received maternal grandmother's completed home study.

On January 24, 2007, Robert A. attended the section 366.26 hearing. Robert A.'s counsel requested a continuance to permit counsel to document Robert A.'s claim that he missed drug tests on November 22 and December 22, 2006, only because there was a problem with the computer and Robert A. subsequently retested. The juvenile court denied the request for a continuance, finding good cause had not been shown. Counsel then objected to termination of parental rights on the basis that P.A. would be better served by placement with paternal grandmother.

At none of these hearings did Robert A. or his counsel ask for family reunification services, seek modification under section 388, challenge the juvenile court's jurisdiction based on lack of notice or any other ground, or dispute the authority of the juvenile court to terminate parental rights. Although Robert A. appeared with counsel who indicated awareness that a petition for modification under section 388 was the appropriate method by which to proceed (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189 [19 Cal.Rptr.3d 801] [a § 388 motion is a proper vehicle to raise a due process challenge based on lack of notice]; *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 481, 487–488 [229 Cal.Rptr. 771] [same]), counsel did not thereafter file such a petition.

Indeed, Robert A. never took steps to obtain custody of P.A., other than to tell the CSW in an interview that he wanted P.A. placed with him in paternal grandmother's home and to make a similar request at the contested section 366.26 hearing. Both of these requests must be seen as perfunctory in light of Robert A.'s failure to seek relief by way of a petition for modification under section 388. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 298, 310 [19 Cal.Rptr.2d 544, 851 P.2d 826].) The failure to seek relief under section 388 on the facts present here must be seen as a concession by Robert A. that any of the claims he might have asserted would have failed.

Additionally, Robert A.'s actions after he became aware of the proceedings contradict his assertion that, had he received notice sooner, he would have requested custody and family reunification services. In March of 2006, the CSW spoke with paternal grandmother about the case and gave her notice for Robert A. Nonetheless, Robert A. failed to contact the CSW and failed to attend the May 31, 2006 hearing. When Robert A. appeared in court, he admitted that a notice sent to his former address had been given to him by the current occupants but Robert A. ignored it.

Because defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court, Robert A. has forfeited the right to raise these issues on appeal. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [13 Cal.Rptr.3d 786, 90 P.3d 746]; *In re B. G.* (1974) 11 Cal.3d 679, 689

[114 Cal.Rptr. 444, 523 P.2d 244]; *In re Gilberto M.* (1992) 6 Cal.App.4th 1194, 1198 [8 Cal.Rptr.2d 285]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 [32 Cal.Rptr.3d 317]; *Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1149 [96 Cal.Rptr.2d 104]; *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1152 [94 Cal.Rptr.2d 693].)

Robert A. claims the forfeiture rule should not apply in this case because the minute orders consistently recite that notice was proper, and the juvenile court did not have access to the court file on the day Robert A. first appeared. Thus, Robert A.'s counsel was unable to review the record with respect to notice. However, neither the juvenile court's recitation that notice was proper nor the absence of the court file prevented Robert A. from objecting to the validity of the notice or filing a petition for modification under section 388.

■ Robert A. further asserts the waiver rule is not enforced when it conflicts with due process, citing *In re Gerardo A.* (2004) 119 Cal.App.4th 988, 993 [14 Cal.Rptr.3d 798]. However, *In re Gerardo A.* involved compliance with notice requirements under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.). These requirements inure to the benefit of the Indian tribes and the child and consequently are not subject to waiver by a parent. (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 849 [131 Cal.Rptr.2d 256]; *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 707 [127 Cal.Rptr.2d 54]; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 739 [109 Cal.Rptr.2d 267].) Thus, *In re Gerardo A.* is not persuasive authority on the issue presented here. Moreover, the rule is that an appellate court *may* review an error despite a party's failure to raise it below if due process rights are involved. (*In re S.B., supra,* 32 Cal.4th at p. 1293.) Here, Robert A.'s persistent avoidance of responsibility for P.A. and his failure to seek any relief in the juvenile court persuades us the forfeiture rule is appropriately applied in this case. To remand the matter now to permit Robert A. to file a section 388 petition he previously declined to file would achieve no purpose other than to delay permanence for P.A., a result we cannot countenance on this record.

2. *Parental unfitness.*

Robert A. contends the juvenile court's failure to make a finding that Robert A. was unfit as a parent precludes termination of his parental rights. (*In re Gladys L.* (2006) 141 Cal.App.4th 845, 848 [46 Cal.Rptr.3d 434].)

■ A parent's interest in the companionship, care, custody and management of his or her children is a fundamental civil right. (*In re B. G., supra,* 11 Cal.3d at p. 688.) The case on which Robert A. places primary reliance, *In re Gladys L.,* stated the relevant legal framework surrounding a parent's right to parent his or her child as follows: "Parents have a fundamental interest in the

care, companionship, and custody of their children. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 [71 L.Ed.2d 599, 102 S.Ct. 1388] . . . .) *Santosky* establishes minimal due process requirements in the context of state dependency proceedings. 'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.' (*Id.* at pp. 747–748.) 'After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge.' (*Id.* at p. 760.) 'But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.' (*Ibid.*)" (*In re Gladys L., supra*, 141 Cal.App.4th at p. 848.)

"California's dependency system comports with *Santosky*'s requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) 'The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' (*Id.* at p. 256.) The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.' (5 Cal.4th at p 256.)" (*In re Gladys L., supra*, 141 Cal.App.4th at p. 848.)

█ California's dependency scheme no longer uses the term "parental unfitness," but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 224, fn. 3 [33 Cal.Rptr.3d 337].)

In *Gladys L.*, a presumed father appeared at the detention hearing and then disappeared for three years. The presumed father was not the subject of any of the allegations of the dependency petition and he was never adjudicated an unfit parent. (*In re Gladys L., supra*, 141 Cal.App.4th at pp. 847–849.) Further, the record in *Gladys L.* did not support DCFS's argument the juvenile court had found that return to the presumed father would cause the child detriment. (*Id.* at p. 848, fn. 3.) *Gladys L.* reversed the order terminating parental rights and remanded to permit the juvenile court to determine whether the presumed father could be the subject of a petition under section 300. (141 Cal.App.4th at p. 849.)

Here, the juvenile court made findings that the return of P.A. to her parents would be detrimental to the child. At the disposition hearing on February 2, 2005, the juvenile court found by "clear and convincing evidence there exists a substantial danger to the children and there's no reasonable means to protect them without removal from *the parents*' custody." (Italics added.) The juvenile court further found DCFS made "reasonable efforts to prevent removal, and the custody of the children is taken from *the parents* and placed in the care, custody, and control of the department for placement with a relative." (Italics added.)

■ Robert A. argues the detriment finding at a disposition hearing must be related to a corresponding jurisdictional finding. However, a child may be declared a dependent if the actions of either parent bring the child within the statutory definitions of dependency. (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 16 [33 Cal.Rptr.3d 242]; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 [58 Cal.Rptr.2d 494] ["a jurisdictional finding good against one parent is good against both"]; *In re James C.* (2002) 104 Cal.App.4th 470, 482 [128 Cal.Rptr.2d 270].) ■ Additionally, a *jurisdictional* finding is not an adequate finding of parental unfitness because it is made by a preponderance of the evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 [49 Cal.Rptr.2d 139]; § 355, subd. (a).) Therefore, even if the dependency petition had alleged Robert A.'s unfitness, the order sustaining the petition would have been inadequate, by itself, to terminate Robert A.'s parental rights without a subsequent finding of detriment by clear and convincing evidence. Thus, the absence of a jurisdictional finding that related specifically to Robert A. does not prevent termination of parental rights. To the extent the disposition in *In re Gladys L.* suggests a sustained dependency petition alleging unfitness of each parent is a necessary precedent to termination of parental rights, we respectfully disagree.

The juvenile court made a second finding of detriment when it denied Robert A. family reunification services under section 361.5, subdivision (b) based on Robert A.'s whereabouts being unknown. The social report prepared for the disposition hearing indicated Robert A. had not maintained any involvement in P.A.'s life, he had not provided support for the child and he had not seen the child for two and a half years.

We conclude the findings of detriment made by the juvenile court in this case are sufficient to support the order terminating Robert A.'s parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

Croskey, J., and Aldrich, J., concurred.