Filed 3/1/13  In re S.P. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | B242175 (Los Angeles County Super. Ct. No. CK91453) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.R., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Boxer McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

## I.  INTRODUCTION

The mother, E.R., appeals from the juvenile court's June 13, 2012 jurisdictional and dispositional orders concerning S.P., the child, who is five years old.  The mother argues there was insufficient evidence to support the juvenile court's jurisdiction under Welfare and Institutions Code section 300, subdivision (b).[1]  The mother denies failing to protect the child and argues the minor was not at risk of serious physical harm as a result of the father's drug use.  The mother also challenges the dispositional order.  She contends the juvenile court abused its discretion in ordering her to attend a parenting class.  We affirm the orders under review.

## II.  PROCEDURAL HISTORY

On January 17, 2012, the Department of Children and Family Services (the department) filed a section 300 petition on behalf of the child.  The petition alleges:  the child's father, David P., had a 16-year history of drug use which rendered him incapable of providing the child with regular care and supervision; the father possessed, used and was under the influence of heroin while the child was in his supervision and care; the mother knew of the father's illicit drug use and failed to protect the child; and the father's drug use endangered the child's physical health and safety and placed her at risk of physical harm and damage.

At the January 17, 2012 detention hearing, the juvenile court ordered the child detained from the father and released to the mother under the department's supervision.  The father was granted monitored visits.  The department was ordered to provide the parents with referrals for any recommended programs.  In addition, the department was ordered to refer the father for weekly random drug and alcohol tests.  Also, the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

department was to refer the mother for twice monthly random and on-demand drug testing.

At the June 13, 2012 jurisdiction and disposition hearing, the trial court found the child was a dependent of the court under section 300, subdivision (b). The juvenile court sustained the following count in the section 300 petition: The [child's father] has a sixteen year history of illicit drug use and is a recent user of heroin [and] methamphetamine, which renders the father incapable of providing the child with regular care and supervision. On at least one prior occasion, the father possessed, used, and was under the influence of heroin, while the child was in the father's care and supervision. The child's mother . . . knew of the father's illicit drug use and failed to protect the child. . . . Such illicit drug use by the father endangers the child's physical health and safety and places the child at risk of physical harm, damage and failure to protect."

The juvenile court placed the child in the mother's custody and ordered the department to provide family maintenance services. The mother was ordered to complete a parenting education program. The father was ordered to complete: a full drug and alcohol program with aftercare; weekly random and on-demand drug and alcohol testing; and parenting education and individual counseling to address case issues. The father was granted monitored visits with the child. In addition, the department was ordered to address the possibility of jurisdiction termination in its next report.

The mother filed her notice of appeal on June 14, 2012.


III  EVIDENCE


A.  Detention Report


The January 17, 2012 detention report was prepared by Children's Social Worker Callie Woodard. On December 20, 2011, the department received a referral alleging substance abuse by the father and his girlfriend, Rebecca W. The father and his girlfriend came to the department's attention after she gave birth to their son, Jason W. Jason W.

3

was born testing positive for opiates. During the course of that investigation, the father reported he had frequent, unmonitored visits with S.P. about two to three times weekly at his house.

On January 5, 2012, Ms. Woodard received a referral for the child. The referral was based on concerns for the child's safety. The reporting party was concerned about the father and Rebecca's admitted drug use and her mental health history. The reporting party was also concerned about the allegedly hazardous condition of the father's home. Ms. Woodard met with the mother and the child at their home.

The mother admitted she was aware of the father's current and past drug use. The mother admitted using drugs with the father. This occurred before she became pregnant with the child. The mother stopped using drugs when she found out she was pregnant and had not used any controlled substances since. The mother believed the father's drug addiction had escalated in recent years. But the mother did not believe this addiction impacted the child. This was because the child rarely saw the father. According to the mother, the child was not left alone with the father. Most of the visits took place outside the father's home or in the maternal grandmother's residence. The mother did not see the father using drugs but witnessed him "coming down from a high" during his visits with the child. The mother stated the child had not been left alone with the father since June 2010. On that occasion, the child was alone with the father for a brief period of time. When the maternal grandfather learned of the visit, he became so concerned that he immediately picked up the child.

The child stated she was in kindergarten. She initially stated she was not alone during her visits with her father. When asked a second time, the child reported she was alone with her father during visits. According to Ms. Woodard, "[The child] stated she once slept over at her father's home and her mother picked her up from home 'when the sun came up.'" The child stated the father never hit her and denied seeing him use drugs. But, she also confirmed she did not know what drugs are and what they look like.

Ms. Woodard also spoke with Juan S., the mother's boyfriend. Mr. S. has known the mother for four years and the child for three of those years. He currently lives with

4

the mother and child in his home. Mr. S. observed several visits between the father and the child. Mr. S. drove the mother and the child to the visits. He stated the visits were very brief and always outside the home. During the visits, Mr. S. did not notice any drug use by the father. He described the mother as "a very loving parent" although a little lenient. Mr. S. witnessed the mother spank the child's bottom with an open palm. But he had not seen the mother otherwise hit or abuse the child.

On January 6, 2012, Ms. Woodard spoke with the father. The father was very hostile. He cursed and threatened her. In addition, the father denied Ms. Woodard access to his home. The father stated he had recently stopped using heroin. When the father visited the child in the past, he had always tried to take drugs prior to seeing the child so he would not have to ingest them during the visit. He admitted once he had injected heroin while in the room with the child because he had not "timed it right" and was coming down from his last high. The father stated he saw the child whenever he wanted to by calling the mother. He also stated he had visited alone with the child and often the visits were unmonitored. The father said the child did not sleep over at his home.

Ms. Woodard observed the father showed various signs of drug use and active intoxication. The father was swaying back and forth throughout the interview. He had sores on his forehead and mouth and twitching facial features. The father was extremely hostile and exhibited erratic behavior. In addition, Ms. Woodard noticed the father had a small circular band aid on the top of his hand and injection marks on his forearms. Ms. Woodard observed the father's home was dark and smelled strongly of cigarette smoke.

On January 6, 2012, Ms. Woodard called the mother. Ms. Woodard inquired about the father's statements that he saw the child several times per week and that some of those visits were unmonitored. The mother stated she did not understand why the father would say this. The mother said the father only visited the child one to two times per month and the visits are always monitored. But the mother admitted the father was allowed unmonitored visits at his home until about one year ago. The mother admitted dropping the child off at the father's home when there was no other available childcare.

5

But the mother characterized leaving the child with the father only as a "last resort" option. The last time the mother allowed the father an unmonitored visit, the maternal grandfather became worried about the child's safety. The maternal grandfather immediately retrieved the child from the father's home. Ever since the mother moved in with her boyfriend about a year ago, she no longer relied on the father as a method of childcare. The mother was asked about the father's drug use in front of the child. The mother responded that she was unaware of it. The mother knew about the father's drug use but "felt bad" for him. The mother wanted to "give him a chance" to be a father. She did not have safety concerns about the child's visits with the father. This was because the visits are now monitored and very brief. The mother did not believe the child knew the father is using drugs. This was because the child is only five-years old.

On January 8, 2012, Children's Social Worker Eva Zendejas spoke with the maternal grandmother, A. A., by phone in Spanish. The maternal grandmother cares for the child while the mother is at work. Ms. A. has never taken the child to visit the father. Ms. A. did not know if the mother took the child to visit the father. Ms. A. reported the child was never left alone with the father because the mother is present during the visits. Ms. A. advised the mother to "not leave the child and father alone" because of his drug addiction. Ms. A. stated the mother is attentive to the child. Ms. A. had no abuse or neglect concerns when the child is in the mother's care.

Ms. A. stated the child rarely saw the father. As far as Ms. A. knew, the child saw the father about two months ago. The father and his girlfriend came to the home to visit the child. The father visited for about 5 to 10 minutes. He hugged and greeted the child, handed the mother $100 and left.

The maternal grandmother did not know about the father's drug use. Ms. A. stated: "I don't know anything about that. I have no contact with him." Ms. Zendejas discussed Ms. A.'s recollections of the mother's drug usage: "[T]he maternal grandmother stated that the mother stopped using drugs when she found out she was pregnant, over 5 years ago. The maternal grandmother stated she spoke to the mother

and advised her to stop using.  The maternal grandmother confirmed that the mother did not participate in a substance abuse program and that 'she stopped on her own.'"

On January 9, 2012, Ms. Woodard spoke with the mother.  Ms. Woodard requested that the mother complete a drug test that day.  This was because of the mother's past drug use.  The mother refused, stating she would not make it to work on time if she took the drug test.  The mother refused a second drug test request the next day, citing the same reason.  Ms. Woodard stated she would document this refusal.  In response, the mother expressed frustration over the department's involvement with her family and its drug test requests.  The child appeared to be afraid of losing her father.  The child was asked about visits with the father.  The child was asked whether Mr. S. stayed during the visits with her father.  Ms. Woodard described the child's response, "[The child] diverted her eyes downward and stated, 'I don't know.'"

On the same day, Ms. Woodard again interviewed the child at her school.  The child was reticent and evasive when discussing the father.  The child was asked if anybody had asked her not to discuss the father.  The child responded "mommy" but refused to elaborate.  Ms. Woodard described what happened when the child was asked a second time about being advised not to discuss the father:  "When asked again if anyone had told her not to talk about her father, [the child] stated 'I don't know.'  To any further questions about her father, [the child] responded by avoiding eye context and stating 'I don't know.'"

Ms. Woodard requested a removal order from the father, which was granted by the juvenile court.  On January 11, 2012, at 11:30 a.m., Ms. Woodard visited the father's home with another social worker and two Los Angeles Police Department officers.  They were present to serve a copy of the removal order on the father.  The paternal grandfather answered the door, wrapped in a blanket.  He demanded to know why they were at the home.  When Ms. Woodard replied the matter was confidential and requested to speak with the father directly, the paternal grandfather grew agitated.  The paternal grandfather stated he would not cooperate with the department.  Ms. Woodard described the paternal grandfather's angry response, "[The paternal grandfather] became increasingly agitated

7

and stated that he was not going to comply with [the department] any longer due to his newborn grandson Jason being removed from [the] father's care." The paternal grandfather continued, "[T]hey won't allow me to bring Jason home because [the father] is living here but that's not going to change." The paternal grandfather complained the department was bringing S.P. into "this mess" for no reason. The paternal grandfather said the child rarely saw the father. The paternal grandfather accused Ms. Woodard of harassing the mother and child. The paternal grandfather stated he had recently spoken by phone with the mother.

The father later came to the door, wearing dark sunglasses. He had his arms clasped across his chest, concealing his forearms. The father had a tremor and shook as he attempted to light a cigarette. He became angry and cursed several times when served with a copy of the removal order.

Ms. Woodard later spoke by phone with the mother about the removal order. The mother stated she understood the conditions of the removal order and would not allow contact between the child and the father. Ms. Woodard asked the mother to take a drug test the next day. Ms. Woodard explained the mother's refusal: "[The mother] stated that she had obtained in attorney and had spoken with an attorney regarding a drug test. [The mother] reported that her attorney had informed her that she did not need to do a drug test as there were currently no allegations against [the] mother." Ms. Woodard stated she would document the refusal to take a drug test. The mother believed the department was making a "huge" deal out of the referral and again expressed her frustration over the situation. The mother later contacted Children's Social Worker Laura Mejia. The mother stated she did not understand why she had to attend the detention hearing. The mother eventually agreed to attend with the child.

## B. Jurisdiction/Disposition Report

The February 23, 2012 jurisdiction and disposition report was prepared by Children's Social Worker Deirdre Evans. On February 9, 2012, Ms. Evans interviewed

8

the mother and the child at their home.  Ms. Evans attempted to interview the child about the father.  But the child was nonresponsive when questioned about her father.  When the child was asked how many times she visited her father, she responded, "Do you want to see my book bag?"  When asked a second time, the child replied:  "I don't know maybe one time.  I don't really know."  When asked what she did when she visited her father, the child stated, "My daddy cooks for me and I watch TV."

The mother stated:  "The one time [the child] was over there [the paternal grandfather] was there.  I think some things were taken out of proportion.  He's never showed any kind of hardness to her.  She has always been supervised when she goes over to her father's home.  We always establish he's sober prior to the visit."  When asked how she established the father's sobriety, the mother responded:  "Well, when I call him on the phone I can tell.  When I see him I can tell if he's ok or not.  He's more active, more skittish when he's on it.  I can tell when he's normal.  The times we go see him it's about ten to fifteen minutes.  I'm always there.  When [the child] was there she was picked up right away by my father."  When asked why the maternal grandfather picked up the child from the father's home, the mother explained, "Well, my father knows about David and he doesn't feel comfortable with [the child] being over there visiting her father."

Mr. S. stated:  "I've met the guy [the father] a few times and I did not notice anything out of the ordinary with him.  I would always drive [the child] over to meet her father.  We always parked out in front of the home.  [The father] usually would come out to talk to [the child] for a few minutes and then we would leave.  I never noticed the guy under the influence of any drugs.  He's always respectful to me.  [The child] was dropped off one time to her father's home and [the maternal grandfather] drove over to pick up [the child] because he did not feel comfortable with his granddaughter at [the father's] home."

## C.  Jurisdiction And Disposition Hearing

At the June 13, 2012 jurisdiction and disposition hearing, the mother offered the following stipulated testimony:  "[O]ther than a single instance in mid-2010, the only time that father has had an unmonitored visit with [the child]; that all other visits have always been monitored by relatives or herself . . . ; that she's been protective of [the child] in her contact with the father."  Counsel for the department stipulated to these facts.

In addition, the juvenile court heard testimony from the father.  He admitted he had a 16-year history of illicit drug use and was a recent user of heroin and methamphetamine.  The father stated the mother knew of his drug use.  He testified, "Every time I would show up to see my daughter she would let me -- she made sure that she could tell that I was not under the influence or rather sober enough to have a good visit with my daughter and not let it affect our relationship."  Also, the father admitted on one occasion he used heroin while the child was in his care.  He explained:  "On one occasion I did start to come down.  I had to actually do a little so that I wasn't pooping all over myself while I was trying to have visitation with my daughter . . . ."  The father testified this unmonitored visit happened about two year ago.  The father stated there had not been any unmonitored contact between him and the child since then.

## IV.  DISCUSSION

### A.  Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  Substantial evidence is relevant testimony or documents which adequately support a conclusion.  It is evidence which is reasonable in nature, credible, and of solid value.  (*In re E.B., supra,* 184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at

10

p. 1433.)  We draw all reasonable inferences from the evidence to support the juvenile court's findings and orders.  We adhere to the principle that fact, weight and credibility issues are the province of the juvenile court.  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)  At the dispositional hearing, the juvenile court has broad discretion to determine the child's best interest and to fashion a dispositional order accordingly.  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 770; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)  We review the dispositional order for an abuse of discretion.  (*In re Drake M., supra,* 211 Cal.App.4th at p. 770; *In re Christopher H., supra,* 50 Cal.App.4th at p. 1006.)

B.  Jurisdictional Finding Under Section 300

Section 300, subdivision (b) states:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶]  . . . (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."  Section 355, subdivision (a) provides:  "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300.  Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence.  Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300 . . . ."  To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that:  there was neglectful conduct by the parent in one of the specified forms; causation; and "serious physical harm or illness" to the child; or "substantial risk" of such a detriment.  (*In re B.T.* (2011) 193 Cal.App.4th 685, 692; *In re Ricardo L., supra,* 109 Cal.App.4th at p. 567; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

11

The mother argues the juvenile court's jurisdictional order was not supported by substantial evidence. The mother contends there was no evidence the child was physically harmed as a result of the minor's exposure to the father's drug use. She also argues there is no current risk of harm to the child.

But jurisdiction is proper based on the sustained allegation against the father, which the father does not contest. The child is a dependent of the court if the conduct of either parent endangers the child in the manner described by one of the subdivisions of section 300. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492; *In re X.S.* (2010) 190 Cal.App.4th 1154, 1161; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.) The Court of Appeal has explained: "[I]t is irrelevant which parent created those circumstances. A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that party once dependency jurisdiction has been established." *(In re I.A., supra,* 201 Cal.App.4th at p. 1492; *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.)

In addition, there was substantial evidence to support the allegation that the mother "knew of the father's illicit drug use and failed to protect" the child. The father has a 16-year history of illicit drug use and is a recent user of heroin and methamphetamine. The mother was aware of the father's drug use. She also admitted the father was allowed unmonitored visits with the child at his home until about a year ago. The father reported he had frequent unmonitored visits with the child about two to three times weekly at his home. The father stated he saw the child whenever he wanted to by calling the mother. The father also admitted he once used heroin while the child was under his care because he was coming down from his high. The father stated that he "always" tried to use drugs prior to the child visiting him so he would not have to ingest them during the visit. The five-year old child acknowledged she had unmonitored visits with her father. The child stated once she slept over at her father's home. The child was not picked up until the next day after "the sun came up." The juvenile court's jurisdictional findings under section 300, subdivision (b) are supported by substantial evidence.

## C. Disposition Order

Section 362, subdivision (a) provides, "If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ." Section 362, subdivision (c) states: "If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." In addition, section 362, subdivision (d) provides: "The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . . That order may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program operated by a community college, school district, or other appropriate agency designated by the court. A foster parent or relative with whom the child is placed may be directed to participate in such a program in cases in which the court deems participation is appropriate and in the child's best interest. The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."

The mother argues it was an abuse of discretion to order her to attend a parenting class. The mother contends as the non-offending parent, her parenting capacity is not at issue. She argues parenting education is not designed to eliminate the father's drug use; the condition which led to the dependency action. We find no abuse of discretion in requiring the mother to attend the parenting class. It is undisputed the father has a serious substance abuse problem. The mother knew of the father's drug use but allowed him unmonitored visits with the child. The mother admitted witnessing the father "coming

13

down from a high" during his visits with the child.  On one occasion, the mother left the child alone with the father until the maternal grandfather retrieved the youngster.  This was because the maternal grandfather was concern about the minor's safety.  The father also admitted he once self-administered heroin while in the room with the child during an unmonitored visit.  And the father admitted using his drugs before visits so he would not have to ingest them in the child's presence.  The parenting education order was well within the juvenile court's discretion.

## V.  DISPOSITION

The jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

ARMSTRONG, J.

KRIEGLER, J.

14