Filed 5/3/13  In re D.G. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | B241502 (Los Angeles County Super. Ct. No. CK85154) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.L., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kimberly A. Roura, Deputy County Counsel for Respondent.

## I. INTRODUCTION

The mother, A.L., appeals from the juvenile court's jurisdictional findings and removal order relating to her son, D.G. The mother argues the juvenile court deprived her of the right to cross-examine the dependency investigator who prepared the jurisdiction/disposition report. The mother requested the dependency investigator be placed on call for the jurisdictional hearing but the investigator was not present at the hearing. The juvenile court refused to continue the jurisdiction hearing and sustained the Welfare and Institutions Code section 300 petition without the dependency investigator's testimony.[1] We agree the mother was deprived of her right to confront and cross-examine the dependency investigator but conclude the error was harmless beyond a reasonable doubt. In addition, the mother challenges the juvenile court's jurisdictional findings under section 300, subdivision (j) that the mother's prior marijuana use in connection with her daughter's dependency case placed her son at substantial risk of suffering serious physical harm or illness. We find substantial evidence supports the jurisdictional findings under section 300, subdivision (j). Finally, the mother contends the removal order must be reversed because reasonable alternatives to removal existed. The mother's challenge of the removal order is moot because the juvenile court subsequently placed D.G. with the mother three months later. Accordingly, we affirm the jurisdictional findings and dismiss the mother's appeal of the removal order.

## II. BACKGROUND

### A. Sibling's Dependency Case

The Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of Christine G., the child's older sister,

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

which was sustained by the juvenile court. Christine tested positive for marijuana when she was born in August 2010. The mother had a history of abusing marijuana. The mother used marijuana during her pregnancy with Christine and tested positive for marijuana at Christine's birth and four days later. The father, E.G., was a current abuser of amphetamine, methamphetamine, marijuana and alcohol and tested positive for those drugs two days after Christine's birth. The juvenile court found when Christine was one-month old, the father repeatedly struck the mother's head with his fists while the mother was holding Christine. The juvenile court ordered Christine placed with the maternal aunt.

In December 2011, the mother gave birth to D.G. The department and the mother agreed to a voluntary family maintenance agreement for D.G. The department permitted D.G. to live with the mother in the paternal grandparents' home provided the father did not reside or visit the home. Under a January 20, 2012 safety plan, the department agreed to recommend Christine be placed with the mother at the February 6, 2012 court hearing, after which the mother would reside with the maternal aunt. The mother agreed to comply with the voluntary family maintenance agreement until June 2012. The mother also would participate in: substance abuse treatment including aftercare services; three months of drug testing; individual counseling for domestic violence for six months; and family preservation for six months.

## B. Section 300 Petition

On February 7, 2012, the department filed a section 300 petition on behalf of D.G. The petition allege three counts each under section 300, subdivision (b) and (j). Counts b-1 and j-1 allege the father has a history of substance abuse, including amphetamine, methamphetamine, marijuana and alcohol, rendering him incapable of caring for the child. The child's sibling, Christine G., was a current dependent of the court due to the father's drug abuse. The father failed to regularly participate in a court-ordered substance abuse rehabilitation program and random drug testing. Counts b-2 and j-2 allege the

3

parents had engaged in domestic violence and Christine was a current dependent of the court as a result of domestic violence by the father. The father failed to regularly participate in court-ordered individual counseling to address domestic violence issues. Finally, counts b-3 and j-3 allege the mother had a history of illicit drug abuse including marijuana which rendered her incapable of caring for the child. The petition also alleged Christine was a current dependent of the court because of the mother's drug use.

## C. Detention Report and Hearing

The February 7, 2012 detention report was written by social worker Olga Flores. The reported indicated on January 24, 2012, the department received a referral alleging emotional abuse and general neglect of D.G. The caller stated the mother continued to live with the father. The informant saw the father in the home on a weekend. The father came to the home after hours to avoid being seen by a social worker. The father was not drug testing and was non-compliant with court-ordered services.

That same day, sheriff deputies Sanchez and Strollo went to the family home and found the father in the home. The father told the deputies he lived in the home with his family. The deputies were not aware of the court orders so they did not take any action.

Later that day, the two deputies returned to the family home with a department social worker, Martha Guevera. When Deputy Sanchez knocked on the door, someone looked through the window and closed the curtain. He knocked again and the mother came to the door. The mother pretended to struggle to open the door and stated the door was jammed. The social worker and deputies heard another door closing, as if someone left the home through a back door. Once they were inside the home, Deputy Sanchez found an unlocked door leading to a small yard and alley. He asked the mother who left through the back door and the mother stated one of the father's brothers might have stepped out. Deputy Strollo found the father's two brothers in a bedroom.

The mother reported she lived with D.G., the paternal grandparents and two paternal uncles. She denied the father lived in the home or visited the home to see D.G.

4

The mother was aware the father was not allowed any contact with D.G. until he contacted the treatment worker. After the social worker stated that the deputies had seen the father at the home earlier, the mother replied she was not aware the father had visited because she had been taking a shower. The mother stated the father has been out of the home since November 2011 and probably stopped by to pick up some money or clothes. She did not have the father's phone number or address but knew the father lived in Huntington Park with one of his brothers. The mother believed the maternal aunt made up lies to prevent Christine from being returned to the mother.

The paternal grandmother reported she lived in the home with her husband, two of her sons, Jaime and Jesus, the mother and D.G. She admitted the father had briefly visited her earlier that day but denied he lived there. The maternal grandmother also denied the father just left the home through the back door. She stated the father had not lived in the home since November 2011. Instead, the father lived with her older son in Huntington Park. The maternal grandmother reported the father visits D.G. twice a week for 20 minutes at a time. She was unaware whether the father was using drugs.

The paternal uncle, Jaime, reported the father lived with another brother. He stated the father visits once in a while to see D.G. but he was not sure how often the father visited because he spent most of time at his girlfriend's house. Another paternal uncle, Jesus, reported the father visited about twice a week, staying for about half an hour each time. Jesus stated the mother and D.G. were usually home when the father visited. He knew the father lived with an older brother but did not know the address.

On January 31, 2012, a different social worker, Olga Flores, visited the home and found the mother and Jaime there. The mother denied the father had visits with the child at the home. She reported she did not have contact with the father. The mother stated she was not using drugs and had been drug testing negative.

On February 1, 2012, social worker Cynthia Gonzalez obtained a warrant to detain D.G. Ms. Gonzalez told the mother the paternal grandmother and uncles confirmed the father was visiting the child. The mother denied the father was visiting D.G. and said the family would inform the court that the father was not visiting the baby. The mother

5

stated the maternal aunt was lying so that Christine would not be removed from the maternal aunt's care. The maternal aunt wanted to keep Christine so she could continue to get paid for taking care of Christine.

At the February 7, 2012 detention hearing, the juvenile court found a prima facie case for detaining the child from the parents. Temporary placement and custody of the child was vested with the department. The parents were granted monitored visits, three times weekly for a minimum of two hours. The juvenile court ordered random drug testing for both parents.

### D. Jurisdiction/Disposition Report

The March 2, 2012 jurisdiction/disposition report, which listed both social worker Cynthia Gonzalez and dependency investigator Dave Fritch in the report's header, was signed by Mr. Fritch. The mother stated the father smoked marijuana every day and drank on the weekends. She last saw the father smoke marijuana in November 2011. The mother reported the father continued to drink one or two times per week.

Concerning the domestic abuse allegation, the mother reported she met the father three years ago when she was 18 years old. They started dating and broke up after Christine's birth because there were "too many problems" in their relationship. Although the couple engaged in name calling, she denied any domestic violence incidents before September 16, 2010. On that day, the father was drinking and the mother told him to follow the paternal grandfather's example by not drinking anymore. The father stated "don't tell me what to do" and hit her about three to four times in the head. One of his punches struck Christine. The mother admitted she hit him three times during the incident.

The mother acknowledged there were incidents of domestic abuse between her and the father in the beginning of the relationship because they were having problems with both of their families. The domestic violence consisted of pushing, shoving and yelling. The incidents occurred about once every two months for a year, and there were

6

occasions when the police were called to their home. The mother enrolled in a domestic violence program once the department became involved.

Regarding the mother's substance abuse, the mother stated she began smoking marijuana when she was 16 years old and used the drug every day for a couple of years. She used marijuana while pregnant with Christine because she had some back pain and was not eating enough. The mother had last used marijuana in March 2011. She has participated in random drug testing since last year and has tested negative. She attended counseling and an aftercare program at the Plaza Community Center. Staff at the Plaza Community Center confirmed the mother completed a drug rehabilitation program and was attending the aftercare program. The mother tested negative for drugs on February 16 and 22, 2012. The maternal aunt had stated she saw the mother use a drug called "Spice" that was the equivalent of marijuana but did not show up on drug tests. When asked if she was using "Spice," the mother said she did not even know what it was.

Before the mother lived with the paternal grandparents, she lived with the maternal aunt and Christine. The mother stated the maternal aunt became upset with her because the maternal aunt wanted the mother to obtain day care for Christine so she could go out with her friends. The mother refused saying she had to attend a class at her drug rehabilitation program. The mother was sent to jail after the maternal aunt alleged the mother physically abused Christine. The mother did not think she had an open criminal case, stating the judge said she did not receive a fair trial and released her "to do programs."

The mother was currently living with various friends and planned to find her own residence after she got her tax return. But the mother also stated she has never held a job. The mother reported she would enroll in domestic abuse counseling in three days. When the mother was asked why she decided to have a second child with the father given their tumultuous relationship, she replied, "it just happened."

Concerning his drug use, the father was not enrolled in drug counseling but would do so. He did not enroll in drug counseling because "they charge" a fee. He stated he last used marijuana five weeks earlier. The father admitted he used methamphetamine

before but last used it when Christine was born. In a previous November 28, 2010 interview, the father said he used methamphetamine once every four months. The father stated he used to drink every day but it has been a year since he drank alcohol. He was exposed to drugs and alcohol as a child because his father used cocaine and abused alcohol.

Regarding the domestic abuse allegations, in the November 2010 interview, the father stated he and the mother had many arguments during their relationship. On September 16, 2010, they argued and the mother hit the father in the face with a cell phone. The father admitted he hit the mother twice in the head while she was holding Christine. He reported the mother stabbed him in the leg with a knife when she was seven months pregnant in June 2010. The father hit her on the back but not her stomach and he was later arrested. The father stated the police wanted him to press charges against the mother but he refused to do so because he wanted to get out of jail as soon as possible. The father was sentenced to 30 days in jail and ordered to attend domestic violence counseling. He had been attending domestic violence counseling for a year but needed to make up four classes.

The father was currently living with the paternal grandparents. While the mother and D.G. were residing with the paternal grandparents, the father only came by to pick up his mail, a new identification card, and some income tax documents. The father admitted he was there the first time the police came to the home on January 21, 2012. He stated he had already left the residence when the police arrived the second time that day. The father denied going out the back door while the police came in the front door.

The maternal aunt stated in January 2012, the parents argued while they were in her home. The mother wanted the father to leave the premises. When the father refused to do so, the mother struck the father in face and kicked him in the legs. The mother hit the father in his face about five times but the father did not retaliate. However, the mother has told the maternal aunt that the father has hit the mother on prior occasions while under the influence of alcohol.

The paternal uncle, Jesus, initially stated the father resided in the home but later said the father only visited and lived with another paternal uncle in Huntington Park. The paternal uncle, Jaime, stated the father came to the paternal grandparents' home once in a while.

### E. Pre-trial Resolution Conference

At the March 2, 2012 pre-trial resolution conference, the mother's counsel asked for the dependency investigator and the material aunt to be on call. The juvenile court suggested the mother should subpoena the maternal aunt. The court set the adjudication hearing for April 23, 2012 and stated "D.I. to be on call." The minute order from the hearing states, "Cause CSW to be on call on 04/23/2012."

### F. Jurisdiction Hearing

At the April 23, 2012 jurisdiction hearing, social worker Cynthia Gonzalez testified she did not prepare the jurisdictional report and was not the dependency investigator. Ms. Gonzalez testified the dependency investigator Dave Fritch wrote the jurisdiction report. But Ms. Gonzalez has been "answering [D.G.]'s case" since he was born. Ms. Gonzalez testified the mother was living at the paternal grandparents' residence when she offered a voluntary services contract for D.G. on condition the father not have any contact with D.G. Ms. Gonzalez had monthly in-person contact with D.G. at either the grandparents' home or at the Plaza Community Center. On January 25, 2012, Ms. Gonzalez had concerns the father was allowed to have contact with D.G. based on a referral to the department. Ms. Gonzalez did not investigate the referral and did not write the detention report. However, Ms. Gonzalez was the social worker who detained D.G. from the mother. D.G. was detained because the department believed the father was living in the home and having unlimited access to D.G.

9

The juvenile court denied the mother's request to call the dependency investigator who wrote the jurisdiction report. The court also denied the mother's offer of proof, stating: "The minute order from March 2nd says the social worker is on call 4/23/12 and this morning parties announced ready. And I started this adjudication at – after 1:30 and so if there was a problem, the witnesses were not here, then someone needed to say they were not ready. This matter has been up on the board at [the] morning calendar call. Parties indicated their readiness. I'm not going to stop in the middle and continue it." The mother's counsel stated she made a specific request on March 2, 2012 that the dependency investigator be placed on call in D.G.'s case. In response, the juvenile court stated, "The minute order reflects it's the social worker who is here."

The mother's counsel then called the mother for testimony. The mother stated she last used drugs in March 2011. She was enrolled in a drug rehabilitation program and attended consistently except during a two-month incarceration period. The mother had completed parenting, anger management and domestic violence classes. When the mother gave birth to D.G., she entered into a voluntary agreement with the department. Under the agreement, D.G. was not to have any contact with his father. The mother admitted D.G. had contact with his father about twice a month for about 20 minutes while D.G. was placed with her at the paternal grandparents' house. She admitted she lied to social workers about the father not having any contact with D.G. The mother stated, "I was afraid because it was not my place to say yes or no for him to visit him because it was not my home. I was not paying rent." The father did not spend the night at the home.

The mother was living with the paternal grandparents because she had nowhere else to go and she wanted to complete her program. The mother stated if D.G. was released to her, she would reside with him at the sober living home where she has been living since April 2012. The mother indicated she would be honest with the social worker about the father's whereabouts in the future. The mother denied Ms. Gonzalez ever asked her whether the father lived with her or visited D.G. Called on rebuttal, Ms. Gonzalez testified she asked the mother several times about any contact the mother had

10

with the father in December 2011 before offering the voluntary family maintenance agreement.

After argument, the juvenile court dismissed count b-3 and sustained counts b-1, b-2, j-1, j-2, and j-3. The juvenile court amended counts b-2 and j-2 by striking the sentence, "The mother continues to reside with the father." The court set a contested dispositional hearing for May 14, 2012 and placed the dependency investigator on call at the mother's request. In addition, the juvenile court ordered a supplemental report to be filed prior to the hearing.

## G. Interim Review Report

The May 14, 2012 interim review report was prepared by Mr. Fritch, the dependency investigator. The mother completed an aftercare program on May 11, 2012. She tested negative six times but failed to show up for a random drug test on February 27, 2012. Since February 2012, the mother missed five group sessions; three of these absences were excused. The mother was enrolled in domestic violence counseling and had attended three to four counseling sessions. Also, she was attending Narcotics Anonymous five days a week.

The mother had monitored visits with D.G. one or two times per week. The father had only visited the child three times since the detention hearing. In addition, the father was dropped from his parenting class program. The department was unable to contact the father by phone because his cell phone service was disconnected.

The department recommended the mother be granted unmonitored visits with D.G. Mr. Fritch, the dependency investigator, expressed concerns about placing the child in the mother's custody because the mother repeatedly sought to deceive the court and department. The mother allowed the father unfettered contact with the child even though she knew this was a violation of the voluntary family maintenance contract. In addition, Mr. Fritch noted the mother allowed the father to have physical contact with D.G. even though she knew the father had struck Christine during a domestic violence incident

11

when Christine was a month old. Furthermore, there was a recent domestic violence incident between the parents that occurred in January 2012. The maternal aunt reported witnessing the mother strike the father in the face about five times.

## H. Disposition Hearing

At the May 14, 2012 disposition hearing, Mr. Fritch testified he recommended the mother have unmonitored visits with the child because she was "doing really well." The mother was participating in drug counseling and her drug tests were all negative for over a year. The social workers had some concerns because the mother had previously allowed the father to have contact with D.G.; thus, they wanted to try unmonitored visits first before releasing the child to the mother. Mr. Fritch testified he had not visited the mother's sober living home and was not aware of what security measures were in place at the program.

After argument, the juvenile court declared D.G. a dependent and removed him from the parents' physical custody. The parents were granted family reunification services. The mother was granted unmonitored visits while the father's visits were to be monitored. The mother was ordered to participate in individual counseling, random drug testing, and a 12-step drug program. The father was ordered to participate in a drug treatment program with random testing and an aftercare program. In addition, the father was ordered to attend: a domestic violence program; parenting classes; and individual counseling to address case issues, including anger management and domestic violence.

The mother filed her notice of appeal on May 17, 2012. Three months later, on August 29, 2012, the juvenile court ordered Christine and D.G. placed in the mother's home under the department's supervision. The court also ordered family maintenance services for the mother.

## III. DISCUSSION

### A. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We review a removal order for substantial evidence in a light most favorable to the juvenile court's order to determine whether sufficient evidence supports the court's findings by clear and convincing evidence. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.) Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. (*In re E.B., supra,* 184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at p. 1433.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

### B. Due Process

Section 355, subdivision (a) states: "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300. . . . "

Section 355, subdivision (b) provides: "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to

13

the extent allowed by subdivisions (c) and (d). [¶] (1) For the purposes of this section, 'social study' means any written report furnished to the juvenile court and to all parties or their counsel by the county probation or welfare department in any matter involving the custody, status, or welfare of a minor in a dependency proceeding pursuant to Article 6 (commencing with Section 300) to Article 12 (commencing with Section 385), inclusive. [¶] (2) The preparer of the social study shall be made available for cross-examination upon a timely request by any party. The court may deem the preparer available for cross-examination if it determines that the preparer is on telephone standby and can be present in court within a reasonable time of the request. [¶] (3) The court may grant a reasonable continuance not to exceed 10 days upon request by any party if the social study is not provided to the parties or their counsel within a reasonable time before the hearing."

The mother argues the jurisdictional findings must be reversed because she was denied her statutory due process right to cross-examine the dependency investigator who prepared the jurisdiction/disposition report. The mother requested the dependency investigator be placed on call during the jurisdictional hearing. The dependency investigator was not present at the jurisdictional hearing but the juvenile court refused to continue the hearing. The juvenile court sustained the dependency petition without providing the mother an opportunity to cross-examine the dependency investigator.

Under section 355, subdivision (b)(2), a parent has a right to cross-examine the preparer of the social study report upon timely request. Here, the mother was deprived of her due process right to confront and cross-examine the dependency investigator who prepared the jurisdiction/disposition report. (*In re Dolly D.* (1995) 41 Cal.App.4th 440, 446.) Because it was error to deny the mother her due process right, we must consider whether this error was harmless beyond a reasonable doubt. (*In re Dolly D., supra,* 41 Cal.App.4th at 446; *In re Amy M.* (1991) 232 Cal.App.3d 849, 867-868.)

We conclude this error was harmless beyond a reasonable doubt. Although the dependency investigator did not testify, another social worker, Ms. Gonzalez, did testify at the jurisdictional hearing. Ms. Gonzalez had been involved in the case from the start and provided ongoing services to the mother and children. Ms. Gonzalez offered the

14

mother the voluntary family maintenance agreement and detained D.G. from the mother after the mother violated that agreement. The mother acknowledged in her testimony that the father was not to have any contact with D.G. under the agreement. Ms. Gonzalez testified she detained D.G. because the father had told sheriff deputies he lived at the home and the father's family confirmed the father visited. The mother admitted she lied to the social workers when she denied the father visited the child.

Also, the mother does not challenge the facts in the detention report which was prepared by another social worker, Olga Flores. Ms. Flores and social worker Martha Guevera interviewed the mother, two sheriff deputies and the father's family during the initial investigation. Neither Ms. Flores nor Ms. Guevera was placed on call by the mother for the jurisdiction hearing. The mother denied the father visited D.G. but her statement was contradicted by the father's family and the sheriff deputies who indicated the father told them he lived at the home. Although the mother asserted the father's family would go to court to deny the father visited D.G., the mother chose not to subpoena the paternal grandmother and uncles. Moreover, the court informed the mother she should subpoena the maternal aunt but that was not done. The maternal aunt had alleged the mother smoked a drug called "Spice" that was similar to marijuana but was not detected by any drug test. The mother denied any knowledge of "Spice" in an interview with Mr. Fritch, the dependency investigator. Given the foregoing evidence, we conclude the failure to allow the mother to cross-examine the dependency investigator was harmless error beyond a reasonable doubt.

## C. Jurisdictional Findings

Section 300, subdivision (j) provides a child is a dependent of the court if "[t]he child's sibling has been abused or neglected as defined in subdivision (a), (b), (d), (e) or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Section 300, subdivision (j) requires the court to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

The mother challenges the section 300, subdivision (j) jurisdictional findings in count j-3. That count states: "The . . . mother . . . , has a history of illicit drug abuse including marijuana, which renders the mother incapable of providing regular care for the child. The child's sibling, Christine [G.] . . . , is a current dependent of the Juvenile Court due to the mother's illicit drug abuse. The mother's illicit drug abuse endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of physical harm and damage."

The mother does not challenge the jurisdictional findings relating to counts b-1, b-2, j-1 and j-2. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451, citing *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876.) Moreover, a child is a dependent of the court if the conduct of either parent endangers the child in the manner described by one of the subdivisions of section 300. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492; *In re X.S.* (2010) 190 Cal.App.4th 1154, 1161; *In re P.A.*

(2007) 155 Cal.App.4th 1197, 1212.)  Thus, the juvenile court has jurisdiction where the acts or omissions of either parent brings the child within section 300.  (*In re Maria R.* (2010) 185 Cal.App.4th 48, 60; *In re John S.* (2001) 88 Cal.App.4th 1140, 1143.)  Here, we discuss the mother's contentions because the jurisdictional findings as to the mother are relevant to her appeal of the removal order.  (*Ibid.*)

The mother argues there was insufficient evidence to support the juvenile court's jurisdictional findings under section 300, subdivision (j) that her marijuana use in connection with Christine's case placed D.G. at substantial risk of suffering serious physical harm.  We disagree.

Substantial evidence supports the juvenile court's jurisdictional findings under section 300, subdivision (j).  The mother admitted she had a history of using marijuana. She began using marijuana at age 16 and used the drug everyday "for a couple of years." The mother smoked marijuana "every other day" while pregnant with D.G.'s sister, Christine, because of back pain and loss of appetite.  Christine was born in August 2010 testing positive for marijuana.  In a prior dependency action, the juvenile court sustained the section 300 petition for Christine, finding the mother's marijuana abuse created a substantial risk to Christine under section 300, subdivision (b).  Christine later was removed from the mother's custody and she did not regain custody until August 2012, when both Christine and D.G. were placed with her.  The mother admitted she last used marijuana in March 2011, at which time she tested positive for marijuana.  Although the mother has been sober for one year, there remained substantial risk that the mother's past neglect of Christine would recur with D.G. if the mother did not receive ongoing drug rehabilitation services through the juvenile court orders.

## D.  Removal Order

Section 361, subdivision (c)(1) provides:  "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and

17

convincing evidence of any of the following circumstances . . . : [¶] (1) [t]here is or would be a substantial danger to the health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." The purpose of the statute is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The juvenile court may consider both the parent's past conduct and the present circumstances. (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

The mother challenges the dispositional order removing D.G. from her physical custody. However, the appeal from the removal order is moot because on August 29, 2012, the juvenile court placed Christine and D.G. with the mother with family maintenance services. "'A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief.'" (*In re I.A., supra,* 201 Cal.App.4th at p. 1490; *Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 364; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1316.)

18

## IV.  DISPOSITION

The judgment is affirmed.  The appeal of the May 14, 2012 removal order is dismissed as moot.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



O'NEILL, J.[*]


We concur:



TURNER, P. J.



KRIEGLER, J.

---

[*]     Judge of the Ventura County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.