Filed 12/13/13  A.C. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| A.C.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G048936<br><br>(Super. Ct. No. DP021927)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Jacki C. Brown, Judge.  Petition denied.  Request for stay denied.

The Law Office of Patricia Smeets Rossmeisl and Donna P. Chirco for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Yana Kennedy for Real Party in Interest A.P.

No appearance for Real Party in Interest G.P.

\*          \*          \*

## INTRODUCTION

A.C. (Father) seeks extraordinary writ relief from an order terminating reunification services as to his now four-year-old son, A.P., and setting a selection and implementation hearing under Welfare and Institutions Code section 366.26,[1] which is scheduled for January 2, 2014.  (Cal. Rules of Court, rule 8.450.)  Father contends (1) his due process rights were violated because the juvenile court failed to find by clear and convincing evidence that vesting Father with custody of A.P. would create a substantial risk of detriment to A.P.'s well-being; (2) insufficient evidence supported the juvenile court's detriment finding; (3) he was denied reasonable reunification services; and (4) the juvenile court improperly delegated its authority regarding visitation to the social worker.

For the reasons we will explain, we find no error in the juvenile court's order.  We therefore deny the petition for a writ of mandate.

## BACKGROUND

### I.

### THE AMENDED PETITION

In November 2011, the Orange County Social Services Agency (SSA) filed a juvenile dependency petition alleging that then two-year-old A.P. came within the

---

[1] All further statutory references are to the Welfare and Institutions Code.

juvenile court's jurisdiction under section 300, subdivision (b) (failure to protect). As amended in February 2012, the juvenile dependency petition (the amended petition) alleged that in November 2011, A.P.'s mother (the mother) gave birth to a child, S.P., at which time both the mother and S.P. tested positive for amphetamines and methamphetamines. The mother admitted to using methamphetamines on a number of occasions while pregnant and while acting as A.P.'s primary caretaker. She had also failed to obtain regular and consistent prenatal care during her pregnancy with S.P.

The amended petition further alleged that A.P.'s father's location was unknown and that his father failed to maintain a relationship with A.P., failed to provide for him, and had been unable or unwilling to protect him from ongoing neglect by the mother. A.P. was detained and placed with non-related extended family members.

II.

THE JURISDICTION AND DISPOSITION HEARINGS

At the jurisdiction hearing, the mother pleaded no contest to the allegations of the amended petition. The juvenile court sustained the allegations of the amended petition and set the disposition hearing. The court also found that SSA had exercised due diligence in its efforts to locate and provide notice of the dependency proceedings to A.P.'s and S.P.'s alleged fathers, based on the limited information the mother had provided about them.

At the disposition hearing, the juvenile court declared A.P. a dependent child of the court under section 360, subdivision (d). The court also ordered that S.P. be removed from the placement she shared with A.P. and be evaluated for a separate placement. As this appeal does not involve any issues related to S.P., no further reference is made to her in this opinion.

3

III.

A.P. IS PLACED WITH CURRENT FOSTER PARENTS; THE JUVENILE COURT
GRANTS FATHER VISITATION WITH A.P.

In March 2012, A.P. was removed from his original placement after problems arose between the mother and the non-related extended family members. A.P. was placed with another non-related extended family member but was removed from that placement due to an illness in that family. On July 13, 2012, A.P. was placed in the foster home of D.P. (the foster mother) and C.P. (the foster father), where he has since remained by the last report in our record.

After having previously given SSA false information about the identity of A.P.'s father, the mother informed SSA that on November 28, 2012, she had contacted Father about A.P. and that he wished to attend the scheduled December 19, 2012 status review hearing and request a paternity test. A social worker thereafter contacted Father who stated he was not sure whether A.P. was his biological child. He also stated he had seen A.P. one year earlier.

At the December 19, 2012 hearing, the juvenile court granted Father's request for a paternity test. On February 11, 2013, SSA received confirmation of the paternity test results which showed that Father was A.P.'s biological father. At a paternity status hearing on February 20, the juvenile court granted Father a maximum of twice-weekly, two-hour, monitored visits with A.P.

In February, a social worker contacted Father about visitation. Father agreed to a one-hour visit with A.P., and communicated his desire to be considered as A.P.'s caretaker and ultimately to be granted custody of A.P. The first visit occurred on February 26. The social worker told the visitation monitor and the foster mother that A.P. should refer to Father as "A[.]" to decrease A.P.'s confusion until there had been more regular visits between A.P. and Father. The visit ended early when A.P. said he wanted to go home.

4

Father cancelled the next scheduled visit on March 5, which upset A.P. Father visited with A.P. on March 12 and 19; those visits were positive as Father attempted to bond with A.P., by bringing toys and snacks and interacting with A.P. The foster mother was reported to have a positive attitude toward Father's visitation with A.P.

IV.

TWELVE-MONTH STATUS REVIEW HEARING

At the 12-month status review hearing on March 25, 2013, the juvenile court found Father to be A.P.'s presumed father. The court ordered continued reunification services to Father and authorized up to six hours' supervised weekly visitation with A.P.

V.

SUMMARY OF EVIDENCE REGARDING FATHER'S PARTICIPATION IN SERVICES AND VISITATION WITH A.P., LEADING UP TO 18-MONTH STATUS REVIEW HEARING

Father lived with his wife and three adult children. As of April 10, 2013, Father's wife did not know about A.P. Father told the social worker he would tell his wife about A.P. if he was granted full custody. Father stated he was not willing to be more proactive in reuniting with A.P., if he was not going to be granted full custody. Father admitted that a year earlier, the mother had attempted to contact him and he knew A.P. was in protective custody. He stated he did not attempt to contact SSA or seek an attorney, figuring it "was all just gossip" that A.P. might be his biological child.

Father signed the juvenile court's case plan on April 23, 2013, and agreed to consider participating in individual counseling and a parenting class. Father initially declined to take advantage of the full six hours of visitation per week, which was authorized by the court, and, instead, preferred one hour, two times per week, of monitored visitation. Father explained that his availability to visit during the week was limited due to his demanding job.

5

Father had eight visits with A.P. from February 26 through April 29, and missed five scheduled visits during that time. On April 23, the foster mother reported that A.P. was confused regarding Father's relationship to him. A.P. appeared anxious and had routinely asked the foster mother whether she will wait on the porch for A.P. to return home from visits. A.P. asked whether the foster home would still be his home.

Father informed the social worker that he did not think visitation at one of SSA's buildings was effective and that he feared A.P. would not bond with him in that setting; the social worker told Father he could have monitored visits at a park. Father visited with A.P. at a park for one hour on May 7, two hours on May 13, and three hours on May 20. Father cancelled a visit scheduled for May 14 due to his work schedule. In May, Father's wife learned about A.P.'s existence because she saw court reports that had been mailed to their home. Her reaction was described by Father's daughter as "shocked and mad." Father reported that his wife wanted to meet A.P. The social worker expressed particular concern about tension in Father's family in light of A.P.'s anxiety.

On May 21, 2013, the foster mother expressed concerns about A.P.'s reactions to visits with Father. She stated that after the visits, A.P. would have a "melt-down," pull pictures off the walls, cry, hit himself, and try to hit her son. She further stated that A.P. had displayed anxiety about leaving the house and her. A.P. asked the foster mother to be sitting on the curb, waiting for him when returns home from visits. A.P. checked on the foster family at night to make sure everyone was still there.

Father requested makeup hours for a cancelled visit, and also expressed the desire to increase visits from four to six hours per week. The social worker told Father that the court had already authorized six hours of visitation per week. Father participated in individual counseling.

On June 4, A.P. came home from a visit with Father and became aggressive toward the youngest foster child in the home. On June 5, during a home visit, A.P. told the social worker that he did not want to have any more visits with Father. The foster

6

mother told the social worker about A.P.'s disrupted patterns of sleep and that he suffered an "extreme level of anxiousness" when either the foster mother or the foster father left the house.

On June 12, the mother told the foster mother that Father said his wife wants nothing to do with A.P., and that he will have to go to a daycare because his wife would not care for him. The mother also expressed concern that Father goes out "all the time" and she was worried about where A.P. would stay under those circumstances if Father had custody. During a July 1 meeting with the social worker, Father's wife stated that she would not treat A.P. poorly and that she was willing to participate in counseling.

On June 17, Father had a three-hour monitored visit at a park with A.P. That same day, the foster mother reported A.P. was anxious before visits and would state he did not want to go with Father and did not want to leave his house. After the visits, A.P. pushed and shoved the other children in the house. The foster mother reported that she had consulted with a pediatrician regarding A.P.'s sleep problem. The pediatrician told her A.P. was showing signs of stress.

On June 24, A.P. refused to go to a visit with Father, stating: "I'm not leaving my house. I'm not leaving my family." On July 2, although the foster mother tried to encourage A.P. to go on a visit, A.P. cried and said he did not want to go. He did not visit with Father on either of those days.

On July 9, the foster mother drove A.P. to the park to meet Father, and assured A.P. she would not leave the park without him.

The next day, the social worker visited Father's residence and was shown the room that A.P. would stay in if he were to live there. Father told the social worker that his family was very supportive of A.P. possibly moving into their home in the future. Father also "expressed his continued support in slowing down the visits, to allow for the child to transition." He expressed "concern that [A.P.] is having tantrums and having a 'hard time' participating in the visits with [him]." Father was agreeable to having the

foster mother and the foster father present during visits in an effort to help A.P. feel more comfortable with Father.

The visit scheduled for July 22 was cancelled due to the lack of an available social worker. The makeup visit was scheduled for July 27 and was monitored by the foster mother and the foster father. During the visit, Father's cousin, who was not an authorized visitation participant, showed up unexpectedly and stayed at the park with them.

On August 1, 2013, pursuant to the parties' stipulation, the juvenile court ordered three hours of supervised visitation and three hours of unsupervised visitation each week. Father's wife was permitted to attend supervised visits only. The court also ordered that Father's makeup visits could be unsupervised if his wife was not present.

During the August 10 visit between A.P., Father, and his wife, Father's wife appeared to be very attentive to A.P. On August 12, A.P. did not want to visit with Father. A.P. screamed, "I don't want to go anymore—don't make me go anymore," and ran to his bed and cried. The social worker assigned to drive A.P. to the visit did not show up due to the accidental termination of the visitation referral for that day. The visit was rescheduled for August 19.

On August 19, A.P. visited with Father and returned home in a calm mood. A.P. stated he was worried no one would be home when he returned.

VI.

AT 18-MONTH STATUS REVIEW HEARING, THE JUVENILE COURT
TERMINATES FATHER'S REUNIFICATION SERVICES AND SETS
PERMANENCY HEARING; FATHER SEEKS WRIT REVIEW.

At the 18-month status review hearing on September 5, 2013, the juvenile court found vesting Father with custody of A.P. would create a substantial risk of detriment to A.P.'s emotional well-being, and found reasonable services had been

8

provided or offered to Father.  The court terminated reunification services and scheduled a permanency hearing for January 2, 2014.

Father timely filed a notice of intent to file a writ petition.  In his petition, Father seeks a peremptory writ of mandate directing the juvenile court to vacate its order at the 18-month status review hearing and enter an order providing for the return of A.P. to Father's care or for additional family reunification services.  Father also seeks a stay of the permanency hearing, pending this court's decision on Father's petition.

During the pendency of this appeal, A.P.'s counsel filed an informal response to the petition in this court, stating, inter alia, that she has "held the same position as father at the eighteen month review hearing [and] . . . had planned to join with father's writ petition, however due to the ever changing nature of this dependency court case, Counsel can no longer support out-right return to the father, nor the requested stay of the 366.26 hearing to determine a permanent plan."  A.P.'s counsel explained she has "recently received information regarding the child's current circumstances which leads Counsel to believe that there now exists a substantial risk of detriment if the child were to be returned to his father's care."  Counsel does not describe this new information, explaining that pursuant to *In re Zeth S.* (2003) 31 Cal.4th 396, this court cannot consider it.  Counsel further states:  "Counsel continues to believe there is nothing about the father personally, nor his current living situation that poses a substantial risk of detriment to the child's safety.  Counsel will concede that father's participation in visits could have been better and father certainly should have told his wife about his child earlier.  Counsel also believes that the agency should have done more to increase the father's visitation so that A.P. was more comfortable with the father.  From the child's point of view it doesn't really matter whether it was the father, or S.S.A.'s fault that there were not enough visits.  Whatever the reason, the emotional detriment remains the same."  A.P.'s counsel concludes:  "Counsel believes that there was enough evidence to support a finding of substantial risk to the child's emotional well-being as A.P.'s anxiety and reaction to the

9

visits was mixed and not necessarily improving. Therefore, although Counsel remains sympathetic to the father's position, counsel requests that this Court deny father's writ petition for return and request for stay, and uphold the trier of fact's decision."

## DISCUSSION

## I.

### PURSUANT TO FATHER'S STIPULATION, THE JUVENILE COURT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT RETURN OF A.P. TO FATHER'S CARE WOULD CREATE A SUBSTANTIAL RISK OF DETRIMENT TO A.P.

Pursuant to section 361, subdivision (c)(1), at the disposition hearing, the juvenile court is required to make any finding that returning the child home would be detrimental to a child by clear and convincing evidence. Here, the juvenile court made that finding, but Father had not yet made an appearance in these proceedings, much less been determined to be A.P.'s presumed father, at the time of the disposition hearing.

At the six-month, 12-month, and 18-month status review hearings, if the juvenile court does not return the child to parental custody, it must find that vesting custody with the parents would be detrimental, but that finding is based on the preponderance of the evidence standard at those stages of the proceedings. (See §§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Accordingly, at the 18-month status review hearing, the juvenile court found by a preponderance of the evidence, under section 366.22, subdivision (a), that vesting custody of A.P. with Father would be detrimental to A.P.

Father argues the juvenile court erred and violated Father's due process rights, by terminating reunification services and setting a permanency hearing at the 18-month status review hearing without having previously made a finding by clear and convincing evidence that vesting custody of A.P. with Father would create a substantial risk of detriment to A.P. (See *Santosky v. Kramer* (1982) 455 U.S. 745, 747-748 [prior to

10

terminating parental rights, due process requires a finding of parental unfitness by clear and convincing evidence]; *In re Gladys L.* (2006) 141 Cal.App.4th 845, 848 ["California's dependency system comports with *Santosky*'s requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit"]; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1211 ["California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child"].)

At the 12-month status review hearing on March 25, 2013, however, Father, who was determined by the court to be A.P.'s presumed father, stipulated that the court find, *by clear and convincing evidence*, that vesting custody of A.P. with Father posed a substantial risk of detriment to A.P. The stipulation stated, inter alia: "Subject to approval of the Court, the parties and Counsel propose the following stipulation and request that all findings recommended herein be made by clear and convincing evidence: [¶] . . . [¶] . . . Find pursuant to Sec[tion] 366.21[, subdivision ](f) that return of the child to parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well being of the child." The juvenile court thereafter "ma[de] orders and findings pursuant to signed stipulation filed 3/25/2013" and found, "pursuant to sec[tion] 366.21[, subdivision ](f) . . . that return of the child to parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well being of the child."

Thus, the juvenile court had made a finding, by clear and convincing evidence, that vesting custody of A.P. with Father posed a substantial risk of detriment to A.P., before the 18-month status review hearing at which reunification services were terminated and the permanency hearing was set.

11

## II.

SUBSTANTIAL EVIDENCE SUPPORTED THE JUVENILE COURT'S FINDING
THAT VESTING CUSTODY OF A.P. WITH FATHER WOULD CREATE A
SUBSTANTIAL RISK OF DETRIMENT TO A.P.'S EMOTIONAL WELL-BEING.

Father contends insufficient evidence supported the juvenile court's finding, at the 18-month status review hearing, that vesting custody of A.P. with Father would create a substantial risk of detriment within the meaning of section 366.22, subdivision (a), which provides in pertinent part: "When a case has been continued pursuant to paragraph (1) or (2) of subdivision (g) of Section 366.21, the permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of his or her parent or legal guardian. After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that *the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.* The social worker shall have the burden of establishing that detriment. . . . *The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided.*" (Italics added.)

Section 366.22, subdivision (a) also requires that "[w]hether or not the child is returned to his or her parent or legal guardian, the court shall specify the factual basis for its decision." We review the juvenile court's finding of substantial risk of

12

detriment under section 366.22, subdivision (a) for substantial evidence. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 456.)

Here, the juvenile court explained its factual basis for determining that vesting custody of A.P. with Father would create a substantial risk of detriment to A.P.'s emotional well-being. The court stated: "I do find that return . . . of this child to the father when detained from the custodial parent at age two, returning this child to a completely unknown and absent parent at age three would create a substantial risk of detriment to the child. [¶] I am using 'substantial risk of detriment' as defined by the infliction of trauma from the disruption of the only life, home and family sphere that he has ever known and that this would result in the destruction of the emotional well-being of the child." The juvenile court cited, inter alia, the following evidence in support of its detriment finding: (1) A.P.'s negative behavior following visits with Father, including throwing tantrums; (2) A.P. displaying "extreme confusion" about the idea that Father was his father; (3) A.P.'s refusal to urinate during visits with Father at the park; (4) a report that A.P. would exhibit distress in leaving his foster home for visits and would display little affection toward Father; and (5) A.P. living with constant anxiety and repeated refusals to attend visits with Father.

The court also observed that A.P's significant anxiety was not eased by Father's failure to call or confirm some scheduled visits; his failure to pursue more visitation time with A.P.; his initial refusal to provide SSA with his home address and, thus, delaying an assessment of his home for A.P.'s possible placement; and his failure to provide the foster mother with requested photographs of himself and his family to help A.P. become more familiar and comfortable with Father.

Substantial evidence supported the juvenile court's factual findings supporting its ultimate determination that vesting custody of A.P. with Father would create a substantial risk of detriment to A.P.'s emotional well-being.

Citing *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401, Father argues, "[p]roving substantial detriment cannot mean merely proving that a parent's living arrangement is less than ideal." As quoted *ante*, the court's factual findings in this case are far broader than, and different from, describing Father's living arrangements. In contrast, in *In re Yvonne W.*, the appellate court concluded insufficient evidence supported a detriment finding, stating, "[a] child's dislike of a parent's living arrangement, without more, does not constitute a substantial risk of detriment within the meaning of section 366.22, subdivision (a)." (*In re Yvonne W.*, *supra*, at p. 1401.)

Furthermore, at the 18-month status review hearing, the juvenile court stated: "I never considered the extent or quality of the relationship between A[.P.] and his foster parents. I did consider the description and specification of the disruption, confusion, turmoil and anxiety experience[d] by little A[.P.] and did extrapolate or conclude therefrom that if he changed from the only secure home he has ever known, he would suffer greatly." This case is thus also distinguishable from *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507, in which the juvenile court improperly considered the quality of the relationship between the child and the de facto parents in deciding to terminate reunification services.

### III.

#### FATHER WAS PROVIDED OR OFFERED REASONABLE REUNIFICATION SERVICES.

Father contends the juvenile court erred when it found reasonable reunification services had been offered or provided to him. "Family preservation is the priority when dependency proceedings commence. [Citation.] 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Therefore, reasonable reunification services must usually be offered to a parent. [Citation.] SSA must make a ""good faith effort"" to provide reasonable services responsive to the unique needs of each family. [Citation.]

14

'[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]' [Citation.] . . . The adequacy of SSA's efforts to provide suitable services is judged according to the circumstances of the particular case. [Citation.]" (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) We review the juvenile court's finding that reasonable services had been provided or offered for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

Here, a case plan was developed, after Father was determined to be A.P.'s presumed father, which included therapy, couples counseling, a parenting class, and visitation. Substantial evidence showed Father was provided these services and visited with A.P.

In his petition, Father argues the social worker failed to offer Father reasonable reunification services because she (1) improperly limited his visitation; (2) failed to include Father's wife in visitation or therapy; and (3) failed to assess Father's home and family "so visitation could occur at father's residence."

Father argues his visitation was limited because two July visits were cancelled. But, the record shows one of those visits was cancelled because A.P. cried and resisted to go on the visit that day; under those circumstances, the decision not to force A.P. to attend that visit was reasonable. A second visit was cancelled due to an inadvertent error that resulted in the termination of the visitation referral for that day. Father points out that the mistake in cancelling that visit caused a 10-day gap between visits in August. Although visitation between Father and A.P. had a few bumps in the

15

road, they did not rise to the level of Father not having been provided reasonable reunification services.

Father also argues the social worker improperly moved Father's visits from taking place at a park back to an SSA building with an in-home coach. Father does not offer any legal authority or facts showing that the provision of visitation under those circumstances was unreasonable.

Father contends that although he had asked that his wife attend visits with him in May, the court did not authorize his wife to participate until June. Father blames the social worker for this delay, arguing that the social worker had known for four weeks that his wife wanted to participate in visits, but did nothing to facilitate that visitation during that time period. Father also argues the social worker knew for two weeks that his wife wanted to participate in therapy, but failed to contact his wife during that time period. Although Father's wife's participation in visitation and therapy was not approved as quickly as Father might have liked, within a month of making those requests, Father's wife was given approval to participate; she received approval to participate in visitation on June 12 and in therapy on July 25. This delay in facilitating Father's wife's participation in services did not render the services provided unreasonable.

Father argues the social worker did not evaluate Father's home or family. The record shows Father initially refused to provide SSA with his home address because he did not want his wife or family to learn about A.P. unless Father was granted full custody of A.P. Father's wife became aware of A.P. sometime in May 2013 and SSA was advised of her awareness at some point later that month. Father's home was evaluated on July 10, 2013. The social worker might have been able to facilitate having Father's wife and children fingerprinted in anticipation of A.P.'s possible placement in their home. But, in light of the fact that Father's wife was not yet permitted to have unsupervised contact with A.P., combined with A.P.'s high level of anxiety in response to visiting with Father at all, the social worker's failure to have fully vetted Father's family

16

by the 18-month status review hearing did not render the reunification services provided to Father unreasonable.  We find no error.

IV.

THE JUVENILE COURT DID NOT DELEGATE ITS AUTHORITY TO DETERMINE VISITATION TO THE SOCIAL WORKER.

Father argues the juvenile court erred because at the 18-month status review hearing, the court improperly delegated its authority to SSA to determine whether Father might be able to visit with A.P.  After ordering that the permanency hearing be set, the juvenile court was required by section 366.22, subdivision (a) to "continue to permit the parent or legal guardian to visit the child unless it finds that visitation would be detrimental to the child."  We review the court's visitation order for an abuse of discretion.  (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557-1558.)

At the 18-month status review hearing, the court stated that the visitation plan ordered on August 1, 2013, pursuant to the parties' stipulation, would continue to be the operative visitation plan.  Father, therefore, was provided three hours' unsupervised visitation and three hours' supervised visitation with A.P. per week; Father's wife was permitted to attend supervised visits.  The juvenile court also stated that "the social worker has only the discretion to liberalize visitation or cancel it if she is given evidence of emotional harm to the child."  The juvenile court did not give the social worker authority to decide whether Father should have visitation with A.P.; the social worker's authority to cancel a visit was expressly conditioned on the existence of evidence the visit would cause A.P. emotional harm.  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009 ["[o]nly when the court delegates the discretion to determine whether any visitation will occur does the court improperly delegate its authority and violate the separation of powers doctrine"]; see *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 73 [visitation order "subject only to the custodial facility's visitation rules and the requirement that visitation not be detrimental to [the child]"].)

17

The juvenile court's order allowing the social worker to cancel a scheduled visit when confronted with evidence it would cause A.P. emotional harm was particularly appropriate in this case, given the evidence before the court of A.P.'s high level of anxiety and strong negative reactions to visits with Father.  The juvenile court, therefore, did not err by authorizing the social worker to cancel a visit under such circumstances as it did not constitute an improper delegation of the court's authority.

## DISPOSITION

The petition for a writ of mandate, pursuant to California Rules of Court, rule 8.450, and the request for a stay of the permanency hearing set for January 2, 2014 are denied.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

18