Filed 11/17/20  In re Emily M. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re EMILY M., a Person Coming Under the Juvenile Court Law. | B304431<br><br>(Los Angeles County<br>Super. Ct. No. 19CCJP06060A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JESSICA C.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed in part, reversed in part and remanded with directions.

Michelle E. Butler, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Jessica C., mother of one-year-old Emily M., appeals from the jurisdiction finding and disposition order declaring Emily a dependent of the juvenile court and removing Emily from Jessica's custody after the court sustained a petition pursuant to Welfare and Institutions Code section 300[1] alleging Jessica had mental and emotional problems that rendered her incapable of caring for Emily. Jessica contends the court's jurisdiction finding and disposition order were not supported by substantial evidence. We reverse the jurisdiction finding as to Jessica, reverse the order removing Emily from Jessica's custody and remand for further findings as to whether reasonable means exist to protect Emily short of removal from Jessica.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Detention of Emily*

In August 2019 the Los Angeles County Department of Children and Family Services (Department) received a report that, on August 9, 2019, Max M., Emily's presumed father, had physically abused Jessica, who was three months pregnant, while she was holding four-month-old Emily. When interviewed by a Department social worker five days after the incident, Jessica

---

[1]  Statutory references are to this code.

2

said Max had been angry at her for not answering his calls earlier in the day. When she returned home, Max yelled at her and pushed her. Jessica tried to call for help; but Max grabbed her phone and threw it on the ground, causing it to break. Jessica picked up Emily and left the house, intending to walk to a nearby relative's house. Max followed her, pulled her by the hair, grabbed her arm and told her she "wasn't going anywhere." A passerby threatened to call the police, at which point Max returned home and Jessica was able to safely take Emily to her friend's house. The next day Jessica called the police, and reported the incident. The police report and the social worker's report stated Jessica had four bruises on her shoulders as a result of Max grabbing her. Max was arrested for spousal assault, vandalism and preventing a victim from calling law enforcement. An emergency protective order was issued for Jessica.

Jessica told the social worker she and Max had been in a relationship for more than a year and had lived together for about eight months. She insisted there had been no prior domestic violence incidents and this was the first time Max had gotten so angry she could not calm him down.

During the month after the incident Jessica wavered on whether she would seek a restraining order against Max. She and Emily had been living with Jessica's mother and stepfather since the incident, and she had no contact with Max. When she first spoke to the social worker on August 14, 2019, Jessica said she was afraid for Emily's safety and had no intention of reconciling with Max. She planned to apply for a restraining order. Two days later Jessica told the social worker she was not sure she would seek a restraining order because she did not

believe Max would try to contact her or hurt her or Emily. After the social worker explained the Department's concerns about Emily's safety, Jessica agreed to seek a restraining order the following week when she returned from a family vacation. Ultimately, Jessica did not apply for a restraining order against Max. In addition, she informed the district attorney she did not wish to pursue criminal charges against Max, and no criminal prosecution was initiated.

On August 20, 2019 Jessica asked to meet with the social worker. She said she wanted to reconcile with Max although she still had not had contact with him and did not know how he felt. She also stated living in her mother's home was not entirely supportive because she did not get along with her stepfather. She reported her stepfather had hit her when she was a child, causing her to have suicidal thoughts at the time. Jessica was determined to teach Emily not to allow anyone to mistreat her and to tell someone if anything bad happened to her.

During her conversations with the social worker, Jessica was forthcoming about her current and past mental health. She disclosed she had been diagnosed with depression a few years earlier during a difficult divorce. She had sought treatment in therapy and had been prescribed medication. Jessica also felt depressed immediately after Emily's birth because the baby was born prematurely and spent time in the neonatal intensive care unit. Initially Jessica reported she did not feel depressed after the domestic violence incident. However, after several weeks Jessica told the social worker she believed the domestic violence incident had brought up past trauma relating to the abuse by her stepfather. She agreed to see a therapist.

On August 28, 2019 Jessica agreed to a voluntary safety plan in which she stated she would not engage in any verbal or physical altercations in Emily's presence; would contact the police if Max came to her home and acted inappropriately; and would contact the Department if she decided to move back in with Max. Although it does not appear to have been required by the safety plan, Jessica agreed to begin therapy, domestic violence classes, parenting classes and to seek housing assistance. She declined the Department's offer to refer her to services, stating she was uncomfortable with government-recommended services due to her immigration status. She said she would seek services on her own.

Emily's pediatrician reported the baby was up to date on immunizations and there were no concerns of abuse or neglect as of her last visit on August 15, 2019.

On September 12, 2019 the Department, concerned Jessica had not sought a restraining order or criminal charges against Max, obtained authorization to detain Emily from Jessica and Max. It was agreed Emily would stay with her maternal grandmother and Jessica would move.

The Department filed a petition on September 17, 2019 pursuant to section 300, subdivisions (a) and (b)(1), alleging Max's violent conduct toward Jessica endangered Emily's physical health and safety. The petition also alleged under section 300, subdivision (b)(1), that Jessica had "mental and emotional problems including a diagnosis of postpartum depression, depression and suicidal ideations" that rendered her incapable of providing regular care to Emily.

The detention report filed on the same day as the petition stated Jessica had ensured Emily's physical, emotional and

medical needs were met and Jessica's family provided a strong support system. Nonetheless, the Department recommended Emily continue to be detained because Jessica had minimized the domestic violence by not pressing charges, not obtaining a restraining order and expressing a desire to reconcile with Max. The Department also stated it was concerned Jessica's recent depression was untreated.

At the detention hearing on September 18, 2019 Emily was detained from Jessica and Max. The court ordered the Department to provide reunification services to the family and allowed each parent monitored visitation for a minimum of six hours per week.

The Department filed an amended petition on November 13, 2019, adding an allegation under section 300, subdivision (b)(1), that Max had mental and emotional problems preventing him from providing regular care for Emily.

2. *The Jurisdiction/Disposition Report*

In a report filed October 31, 2019 the Department stated Emily was living with her maternal aunt and was cared for by her maternal grandmother. Jessica was living with her uncles.

In an October 17, 2019 interview Jessica described the domestic violence incident that triggered the investigation in substantially the same way she had previously. She explained she had been grocery shopping with her mother when Max called her and sounded agitated. She hung up on him and refused to answer his repeated calls because she knew it would cause a fight. Later, after they had both returned home, he stood only a few inches from her and yelled in her face. Jessica did not want the situation to escalate so she did not engage Max and picked up her phone. Max demanded the phone and, when Jessica did not

comply, he pushed her with both hands on her shoulders and cornered her. He grabbed the phone and slammed it to the floor. Emily was in the room in an infant swing during the altercation. Jessica said she did not want Emily to see the fight, so she picked her up and left the house. Max followed her and told her to come back. She refused, and Max pulled her hair and grabbed her arm. Jessica said she was scared by the incident and had never seen Max act that way before. When she told her family about the incident that evening, they urged her to call the police to protect Emily.

Jessica stated she wanted to reconcile with Max but only if he went to counseling and changed his behavior. She said if Max did not follow through, it would be difficult but she would end the relationship to gain custody of Emily. Jessica also said she would report domestic violence if it happened again because she wanted to protect Emily and did not want Emily to think abuse was acceptable.

Regarding her mental health history Jessica explained she had suffered a period of depression four years earlier while she had been going through a divorce. She had attended therapy and had taken prescribed medication for approximately six months. She had suicidal thoughts during that time, but she insisted she would never act on them. Jessica also felt depressed immediately after Emily's birth because Emily had been born prematurely and spent time in the neonatal intensive care unit. Jessica had been worried about Emily's health and had been sad to see her connected to machines. Regardless, she reported she spent hours in the hospital caring for Emily and refused to leave even when nurses told her to go home and rest. Jessica had derived support from talking with the other mothers and the nurses.

The Department reported Jessica had made progress on her case plan. She had enrolled in a 24-week domestic violence victim program and a 12-week parenting class. However, Jessica had not visited Emily during the month after the detention hearing because she lived far away and did not have a car. She did visit with Emily twice in late October.

In interviews with the Department Max, Jessica's mother, Jessica's sister and Max's mother stated Jessica was an attentive mother and they were not concerned about Emily's safety with Jessica. None of them was aware of Jessica's mental health issues until the Department's involvement.

The Department recommended Emily be removed from Jessica and Max. Given their expressed desire to reconcile, the Department believed Jessica and Max should attend domestic violence awareness classes before reunification. The Department also expressed concern regarding Jessica's mental health. In particular, the Department noted Jessica had gone into labor in mid-October, at only five months pregnant, and the baby had not survived. The Department opined this experience could cause a setback for Jessica's mental health.

In a last minute information filed on January 7, 2020, the Department reported Jessica had ceased attending domestic violence victim and parenting classes. Jessica had completed six sessions of each class before informing the Department in mid-December 2019 she would not be able to attend due to cost and her need to find employment.

The January 7, 2020 filing attached a letter from Jessica's therapist, dated November 13, 2019, stating Jessica had attended three therapy sessions in late October/early November but had been a no-show for two sessions. The letter stated Jessica had

been diagnosed with "major depressive disorder, recurrent, moderate" and was working toward decreasing her depressive symptoms.

### 3. *The Jurisdiction/Disposition Hearing*

At the jurisdiction/disposition hearing on January 7, 2020 Jessica's counsel asked the court to dismiss the petition as to Jessica, arguing there was no evidence her mental health had interfered with her ability to care for Emily. Max's counsel argued the petition should be dismissed because Emily had not been harmed. Emily's counsel, however, requested the court sustain the petition and add an allegation to the domestic violence count stating Jessica was unable to protect Emily from Max due to her emotional and mental health issues.

The court amended the petition by interlineation to remove the reference to postpartum depression because Jessica had never received that diagnosis and sustained the petition as amended. The court explained it believed there was a risk to Emily's safety because both parents struggled with mental health issues, which "manifested itself in an act of violence."

Proceeding immediately to disposition, Jessica's counsel requested Emily be released to Jessica on condition that Jessica would live with her mother. Emily's counsel stated he was conflicted but, given that the letter from Jessica's therapist did not give any detail about her progress, requested Emily be removed from her parents.

The court declared Emily a dependent of the court and found by clear and convincing evidence there would be substantial danger to her physical health or safety if returned to her parents' physical custody and further found there were no reasonable means to protect her without removal. As the basis

9

for its determination removal from Jessica was warranted, the court stated the diagnosis of major depressive disorder "raises a red flag" and "without an indication of what the treatment is going to be or what the prognosis is, [a home of parent order is] asking the court to take a leap of faith here."

## DISCUSSION

### 1. *The Jurisdiction Findings Are Reviewable*

Max did not appeal, and Jessica does not challenge the juvenile court's jurisdiction findings as to him. Those findings provide an independent basis for affirming dependency jurisdiction over Emily regardless of any alleged error in the finding as to Jessica. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [jurisdiction finding involving one parent is good against both; ""'the minor is a dependent if the actions of either parent bring [him or her] within one of the statutory definitions of a dependent'""]; see *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452; *In re Briana V.* (2015) 236 Cal.App.4th 297, 310-311.) As a result, even if we strike the findings as to Jessica, the juvenile court would still be authorized to exercise jurisdiction over Emily and to enter all reasonable orders necessary to protect her, including orders binding on Jessica that address conduct not alleged in the petition. (*In re Briana V.*, at p. 311 ["The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order"]; *In re I.A.*, at p. 1492 ["[a] jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been

10

established"]; see generally § 362, subd. (a) [the juvenile court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child"].)

Nonetheless, in limited circumstances reviewing courts have exercised their discretion to consider an appeal challenging a jurisdiction finding despite the existence of an independent and unchallenged ground for jurisdiction when the jurisdiction findings "serve[ ] as the basis for dispositional orders that are also challenged on appeal," "could be prejudicial to the appellant or could impact the current or any future dependency proceedings" or "the finding could have consequences for the appellant beyond jurisdiction." (*In re J.C.* (2014) 233 Cal.App.4th 1, 4; see *In re D.P.* (2015) 237 Cal.App.4th 911, 917; *In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

Because the jurisdiction finding as to Jessica served as the basis for the juvenile court's disposition order that is also challenged on appeal, we exercise our discretion to review that finding on the merits.

2. *There Is Insufficient Evidence To Support a Finding as to Jessica Under Section 300, Subdivision (b)*

a. *Governing law and standard of review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re A.F.* (2016) 3 Cal.App.5th 283, 289; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

11

Section 300, subdivision (b)(1), allows a child to be adjudged a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child."  A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements:  (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see *In re R.T.* (2017) 3 Cal.5th 622, 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing *(In re D.L.* (2018) 22 Cal.App.5th 1142, 1146), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.)  The court may consider past events in deciding whether a child currently needs the court's protection.  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216; *In re N.M.*, at p. 165.)  A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe

that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; accord, *In re Kadence P.*, at p. 1384.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find that the order is appropriate. (*Ibid.*; accord, *In re I.C.* (2018) 4 Cal.5th 869, 892.)

> b. *The Department failed to prove Jessica's mental health issues placed Emily at substantial risk of serious physical harm*

Nothing in the record before the juvenile court indicated Emily had been neglected or suffered any actual harm as a result of Jessica's mental health struggles. Despite feeling depressed after Emily was born, Jessica was able to spend significant time at the hospital caring for her, and there were no allegations Emily had been neglected once Jessica brought her home. The family members interviewed by the Department stated Jessica was an attentive mother. Those family members also indicated they had been unaware of Jessica's history of depression, which

13

suggests Jessica had been able to function normally even when depressed.

In the absence of evidence of past harm or neglect, "mental illness is not itself a justification for exercising dependency jurisdiction over a child." (*In re Joaquin C., supra,* 15 Cal.App.5th at p. 563; accord, *In re A.L.* (2017) 18 Cal.App.5th 1044, 1050 ["the law is settled that harm may not be presumed from the mere fact of a parent's mental illness"]; *In re James R.* (2009) 176 Cal.App.4th 129, 136 [reversing jurisdiction finding because "[a]lthough [mother] had a history of mental instability, she had not abused or neglected the minors in the past"].)

The juvenile court based its finding that Emily faced a substantial risk of harm on the domestic violence incident between Jessica and Max, which it posited was a "manifestation" of the parents' depression. The Department takes this argument one step further, contending Jessica's depression "increased the likelihood that she would make choices, such as resuming a relationship with father prior to each of them receiving treatment, that would place Emily at risk of harm."

This supposed link between Jessica's mental state and the risk of domestic violence is entirely speculative. Whether or not Max's mental health may have been a factor in his violent outburst, there was no evidence the confrontation between Jessica and Max was precipitated or exacerbated by Jessica's depression; nor was there any evidence Jessica had made poor decisions when suffering from depression in the past. In fact, there was no evidence Jessica was experiencing depressive symptoms at the time of the August 2019 incident. Even if she had been, she nonetheless demonstrated an ability to protect herself and Emily. When Max became violent, she immediately

14

attempted to remove Emily from the home, called the police the next day and did not go back to the house. Jessica was honest with the social worker about her feelings for Max, but remained adamant she would not reconcile with him unless he changed his behavior. Jessica was also forthcoming with the Department about her mental health issues. She demonstrated she had insight into her situation and had successfully sought help in the past for any mental health symptoms. On this record, there was insufficient evidence to support a finding Emily was at substantial risk of future harm due to Jessica's mental health issues. (See *In re James R., supra,* 176 Cal.App.4th at p. 136 [speculative future harm insufficient to support finding minor at substantial risk of future harm].)

3. *There Is Insufficient Evidence To Support Removal of Emily from Jessica's Custody*

a. *Governing law and standard of review*

Before the court may order a child removed from the physical custody of a parent with whom the child was residing at the time the dependency proceedings were initiated, it must find by clear and convincing evidence that the child would be at substantial risk of physical or emotional harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c); *In re T.V.* (2013) 217 Cal.App.4th 126, 135; see *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 347.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.,* at pp. 135-136.)

In evaluating the propriety of a disposition order removing a child from a parent or guardian pursuant to section 361 and in view of the requirement the juvenile court make the requisite findings based on clear and convincing evidence, we "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

> b. *The facts relied on by the juvenile court do not support a finding by clear and convincing evidence of the need for removal from Jessica*

Even absent the jurisdiction finding as to Jessica, removal of Emily from her custody is not precluded if it is necessary to protect the child and there are no other reasonable means available to ensure the child's safety. (See *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212 [absence of jurisdiction finding as to parent does not preclude finding of detriment if returned that justifies removal].)

In ordering Emily's removal from Jessica's custody, the juvenile court cited Jessica's mental health diagnosis and the lack of evidence concerning her prognosis and treatment plan. As discussed, a parent's history of depression, absent some evidence of a defined risk of harm to the child, is not sufficient to justify removal. Moreover, it was the Department's burden to produce evidence Jessica's prognosis or treatment plan indicated removal was necessary to protect Emily. The absence of evidence on the issue cannot be relied upon as the basis to order removal. (See *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

16

Nonetheless, the Department argues substantial evidence supported removal due to Max's anger issues. It is true a finding parents had engaged in "an ongoing cycle of domestic violence" may be a sufficient basis to find a child's removal is necessary to protect the child. (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156; *In re T.V.*, *supra,* 217 Cal.App.4th at pp. 136-137 ["[a]lthough [minor] had not been physically injured and was otherwise healthy, the court could reasonably find she was at substantial risk of harm as a result of the parents' ongoing domestic violence and there were no reasonable means by which she could be protected without removal"].) However, there was no evidence of ongoing domestic violence between Jessica and Max, nor did the court rely on the single violent episode as the basis for Emily's removal. While Jessica had expressed a desire to resume a relationship with Max, she also indicated she would not do so until he had addressed his anger issues and the relationship did not endanger her custody of Emily.

If, as the Department now suggests, it is Jessica's relationship with Max that creates a substantial risk of harm to Emily, the court must consider whether reasonable means exist to protect Emily that are less drastic than removing her from Jessica. (§ 361, subd. (d); see *In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 [remand is necessary for court to make proper findings as to whether there were reasonable means to protect child other than removing child from nonoffending father; "'reasonable means' of protecting the children that should at least have been considered include unannounced visits by [Department] . . . and removing [offending] Mother from the home"]; see generally *In re Henry V.* (2004) 119 Cal.App.4th 522, 530-531 ["[b]ecause we so abhor the involuntary separation of

17

parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures"].)

Accordingly, the disposition order as to Jessica is reversed, and the matter remanded for a new disposition hearing. On remand, the juvenile court is to make its decision based on the facts existing at the time of the further proceedings.

## DISPOSITION

The jurisdiction finding and disposition order as to Jessica are reversed, and the matter remanded for a new disposition hearing and for other further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.